279 N.J. Super. 154 (1994)
652 A.2d 253
FAIZA ALI, PLAINTIFF,
v.
QASSEM IZZAT ALI, DEFENDANT.
Superior Court of New Jersey, Chancery Division Union County, Family Part.
Decided May 2, 1994.
*157 Marion Solomon for plaintiff (Monaghan Rem & Zeller, attorneys).
Wendy Parmet for defendant (Parmet & Zeif, attorneys).
WHITKEN, J.S.C.

PROCEDURAL HISTORY
This matter originated by the filing of a complaint by the plaintiff on September 16, 1993 seeking a divorce from the defendant, sole legal custody of the child of the marriage, permission to resume her maiden name and counsel fees. Thereafter, a motion was filed by the plaintiff to direct the defendant to return the infant child of the marriage, Nader, to her care, custody and control, to direct that the defendant appear before this court to provide information as to the whereabouts of Nader, for pendente lite custody, to restrain the defendant from any unsupervised contact with the infant child and for counsel fees. The plaintiff in her supporting certification contended that the defendant failed to return Nader from Gaza to New Jersey.
This court entered an order on October 25, 1993 providing that within five days of the service of said order, the defendant was to return Nader to the care and custody of the plaintiff, that the *158 plaintiff was to have pendente lite custody of Nader, for service of the order on the defendant and requiring the defendant to appear before this court on November 18, 1993 to show cause why custody of Nader should not be continued with the plaintiff. This court further found that based upon the residence of Nader, New Jersey properly had jurisdiction over this matter as to the issues regarding the care, custody and welfare of Nader.
A subsequent order was entered by this court on January 10, 1994 providing that the defendant be arrested, committed and confined to the Union County Jail by the Sheriff of Union County and that a warrant be issued for the defendant's arrest, commitment and confinement indicating that the defendant was to be released upon his return of Nader to the plaintiff's custody and that failing to do so, he was to be brought before this court. A subsequent order on January 20, 1994 granted pendente lite custody of Nader to the plaintiff. On March 9, 1994 this court executed a consent order permitting the defendant additional time to answer or otherwise move with respect to the summons and complaint through and until March 17, 1994.
A motion, which is the subject matter of this opinion, was thereafter filed wherein the defendant husband alleged that the ex parte order of this court entered on October 25, 1993 should be vacated for the following reasons:
1. Lack of in personam jurisdiction over defendant;
2. Under the doctrine of comity, the order obtained by the defendant from the Sharia Court in Gaza granting him a divorce and custody of Nader controls and is entitled to recognition and enforcement by this court;
3. Gaza, and not New Jersey, is the "home state" of the child born of the marriage.
4. The doctrine of forum non conveniens mandates that the custody issue be litigated in Gaza, and not New Jersey where the burden on the defendant would be great.
The various contentions of the defendant will be treated individually and in succession.

*159 LAW

(1) LACK OF IN PERSONAM JURISDICTION
The seminal case involving the exercise of in personam jurisdiction is International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945),[1] wherein the Court set forth the test to determine whether exercising this jurisdiction would "offend `traditional notions of fair play and substantial justice.'" quoted in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490, 498 (1980). The Fourteenth Amendment's Due Process Clause, which is applicable to the states, "limits the power of a state court to render a valid personal judgment against a nonresident defendant." World-Wide Volkswagen, supra, 444 U.S. at 291, 100 S.Ct. at 564, 62 L.Ed.2d at 497 (citing Kulko v. California Superior Court, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132, 140-41 (1978)). When a judgment fails to comport with the due process requirements, it "is void in the rendering State and is not entitled to full faith and credit elsewhere." Id. (citing Pennoyer v. Neff, 95 U.S. 714, 732-33, 24 L.Ed. 565, 572 (1878)). Due process requires sufficient notice of the action, Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313-14, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950), and that the court have personal jurisdiction over the defendant. International Shoe, supra, 326 U.S. at 316, 66 S.Ct. at 161, 90 L.Ed. at 102. In the present case, the defendant was personally served in Gaza on December 23, 1993 with the ex parte order entered on October 25, 1993, the summons and complaint for divorce, and motion papers. The defendant does not raise the issue of "notice" in his moving papers. Rather, the defendant asserts that this court lacks in personam jurisdiction[2] and thus is not empowered to enter any orders or judgments against him.
*160 For a state to exercise in personam jurisdiction over a defendant, sufficient "minimum contacts" between the defendant and the forum state must exist. International Shoe, supra, 326 U.S. at 316, 66 S.Ct. at 161, 90 L.Ed. at 102. The purpose of the "minimum contacts" requirement is twofold; namely it:
[1] protects the defendant against the burdens of litigating in a distant or inconvenient forum. [2] And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.
[World-Wide Volkswagen Corp. v. Woodson, supra, 444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 498.]
A "minimum contacts" determination requires that the defendant must have purposefully availed himself of a state's benefits. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542-43 (1985). Although foreseeability is not one of the foremost criteria in a due process evaluation, it plays a role in the inquiry as to whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen, supra, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d at 501. If "minimum contacts" are found to exist through the purposeful activities of the defendant, the court's inquiry turns to whether "fair play and substantial justice" permit the exercise of in personam jurisdiction. Burger King, supra, 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543.
In the present case, the plaintiff/wife was born in Elizabeth, New Jersey and is an American citizen[3] and the defendant/husband is a Palestinian national. After graduating from Elizabeth High School in New Jersey in 1982, the plaintiff traveled *161 to Jerusalem to visit cousins and pursue her college studies. As a student at Bir-Zeit University on the West Bank, the plaintiff met the defendant, a resident of Gaza. On July 23, 1983, the plaintiff and defendant were married in a Muslim ceremony in Beit Hanoun, Gaza. As husband and wife, the parties resided in Gaza. In 1985, the plaintiff became pregnant. A few months prior to giving birth to Nader on February 1, 1986, the plaintiff returned to Elizabeth, New Jersey. As to why the plaintiff returned to New Jersey, the parties' explanations diverge. The defendant asserts that the plaintiff returned to American soil so that their child would have all of the privileges afforded to an American citizen. The plaintiff asserts that she returned home to attend beauty school, which she completed in August or September of 1986.
From approximately September 1986 until January 1991, which amounts to a period of about 4 years and 4 months, the plaintiff, defendant, and Nader lived as a family unit in Gaza. At the outbreak of the Gulf War in January of 1991, the plaintiff and Nader returned to Elizabeth, New Jersey. The defendant claims the plaintiff and Nader came back to Gaza in the Spring of 1991 whereas the plaintiff alleges it was in July 1991. In July 1991, the plaintiff again left Gaza for Elizabeth, New Jersey for a "trial separation" according to the defendant. What the plaintiff's certification fails to say is significant in that the plaintiff apparently left Nader in Gaza in the defendant's care when she left Gaza in July 1991. The defendant eventually obtained the appropriate travel documents from the Israeli authorities and left Gaza for the United States and was accompanied by Nader. According to the plaintiff, Nader "was back in Elizabeth, N.J. with me in time to start" school in September of 1991 and was enrolled in the Robert Morris School Number Eighteen in Elizabeth, where he completed both kindergarten and the first grade.
The plaintiff intimates that the defendant lived in New Jersey but eventually moved to New York City, although no dates are provided. The defendant states that he lived in New York and *162 that Nader lived with the plaintiff in Elizabeth on weekdays during the 1991-1992 academic year; furthermore, on weekends Nader would either reside with the defendant in New York or the defendant would come and spend the weekend in Elizabeth. During the 1992-1993 academic year, the defendant claims he never came to Elizabeth, where the plaintiff and Nader resided, except to pick up and drop off his son for visitation purposes.
The plaintiff offers additional proof to substantiate her claim that the defendant had sufficient contacts with New Jersey stating that the defendant's address on his green card application was that of Elizabeth, New Jersey. The defendant refutes the contention that he resided in New Jersey at this time; rather, he argues that the New Jersey address was used "for purposes of convenience only." The plaintiff also attached copies of the defendant's W-2 form for 1992 from WorldWide Television; however, it should be noted that the defendant's address is listed as "339 East 88th Street, New York, NY." The defendant apparently used Elizabeth, New Jersey as his residence for purposes of filing his joint tax returns.
In May or June of 1993, the defendant left the United States and went to Paris for a visit en route to Gaza. The plaintiff brought Nader to Paris in July of 1993 and met the defendant. The plaintiff continued on to Jerusalem whereas the defendant and Nader remained in Paris for a few weeks. On or about July 10, 1993, the family was reunited in Gaza although the time spent together varies according to the certifications. On July 15, 1993, the plaintiff left Gaza for the United States and claims that the defendant was to return to New York with Nader in a few weeks. The defendant claims the plaintiff knew he had a job offer in Gaza from ABC News, which the plaintiff denies, and that he would remain permanently in Gaza with Nader.
On July 28, 1993, the defendant obtained an ex parte divorce from the Sharia Court in Gaza, which granted him custody of Nader, and published notice to the plaintiff in Al-Quds, an Arabic newspaper in Jerusalem and the Occupied Territories. The defendant *163 claims the plaintiff received "actual notice" of the divorce and her right to appeal through her family members, who reside on the West Bank, and that the defendant spoke to the plaintiff on the phone and confirmed the divorce proceedings. The defendant claims the plaintiff knew she had ninety days to appeal the Sharia Court's custody and divorce decision and that, furthermore, the plaintiff should have known her rights since her father divorced her mother in a similar fashion. The plaintiff states her first "notice" of the divorce came with the defendant's moving papers, which were filed with this court on March 7, 1994.
Based upon the fact that the defendant was amenable to using New Jersey for purposes of "convenience" although he now denies that he ever had sufficient contacts with New Jersey since it would be quite "inconvenient" for him to litigate this matter here, this court is satisfied that it has in personam jurisdiction over the defendant. Although the defendant is a Palestinian national, and evidently intends to continue living in Gaza, he has had sufficient contact with New Jersey so that the exercise of in personam jurisdiction would not offend "traditional notions of fair play and substantial justice."

(2) THE SHARIA COURT CUSTODY DECREE
The defendant asserts that he is entitled to custody of Nader based upon the Sharia Court's decree entered on July 28, 1993, from which the plaintiff failed to appeal, and based upon the doctrine of comity. The doctrine of comity has been defined as:
neither a matter of absolute obligation on the one hand nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience and to the rights of its own citizens or of other persons who are under the protection of its laws....
The recognition of a judgment of a foreign court under the principle of comity is subject generally to two conditions: (1) that the foreign court had jurisdiction of the subject matter; (2) that the foreign judgment will not offend the public policy of our own State.
[Fantony v. Fantony, 21 N.J. 525, 533, 122 A.2d 593 (1956) (internal citations omitted).]
*164 Under this doctrine, the lack of notice provided to the plaintiff raises serious due process concerns at the outset.
In In re the Marriage of Malak, 182 Cal. App.3d 1018, 227 Cal. Rptr. 841 (1986), the court enforced a Lebanese custody decree, which the husband had obtained and sought to have enforced. The husband had filed the Lebanese judgment requesting that it be enforced pursuant to the applicable provisions of the Uniform Child Custody Jurisdiction Act [hereinafter "UCCJA"].[4] Although the Lebanese decree had been entered ex parte, the wife was personally served with the decree and had fifteen days after service to file opposition and have the issues tried de novo. The wife failed to appeal and the decree was thereafter finalized. Id.
The UCCJA apparently applies to international decisions as long as they are made by "legal institutions similar in nature." Id., 227 Cal. Rptr. at 845. The UCCJA, which is codified in New Jersey at N.J.S.A. 2A:34-28 to -52, provides that:
The general policies of this act extend to the international arena. The provisions of this act relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature and to custody rendered by appropriate authorities of other nations, if reasonable notice and opportunity to be heard were given to all affected persons.

[N.J.S.A. 2A:34-51 (emphasis added).]
To effectuate comity under the UCCJA the first requirement is that a "certified copy of a custody decree" must be filed with the court clerk so that it may be enforced. In re the Marriage of Malak, supra, 227 Cal. Rptr. at 846; see also N.J.S.A. 2A:34-43 a. Here, the defendant has failed to file a certified copy of the Sharia Court's order, which he seeks to enforce. He merely attached a copy of the published notice of the divorce along with a translation. Thus, the defendant has not taken the first required step towards enforcement.
*165 In In re the Marriage of Malak, the divorce and custody decree were entered ex parte; however, the wife was later personally served with the documents. 227 Cal. Rptr. at 846. "Thus, while the ex parte order was obtained without due process, the same cannot be said of the final decree." Ibid. To the contrary, the defendant herein never states that the plaintiff was personally served with the ex parte order obtained from the Sharia Court in Gaza. The defendant attempts to impute knowledge to the plaintiff based upon her relatives' alleged knowledge, a telephone call between the defendant and plaintiff, and plaintiff's prior knowledge of how her father divorced her mother. The defendant's position hardly can be construed as "actual knowledge" to satisfy due process considerations and cannot supplant the requirement of personal service. On this basis alone, the Sharia Court's decree cannot be enforced under principles of comity since it directly offends all due process requirements of notice.
Recognition of the Lebanese custody order by the Malak court was also warranted since the order specifically enumerated the various underlying factors which were considered in the final determination; the Malak court found the considerations to be substantially similar to those into which a Californian court would make an inquiry. Id. 227 Cal. Rptr. at 847-48 and n. 1. Thus, enforcement was justified.
In Custody of a Minor (No. 3), 392 Mass. 728, 468 N.E.2d 251, 252 (1984), the court analyzed a request to enforce an Australian custody decree obtained by the father with "adequate notice" to the mother in Massachusetts. The court observed that:
One can imagine a case in which recognition of a foreign country's custody determination would not be due.... The foreign court must have jurisdiction over the parties and the subject matter.... The procedural and substantive law applied by the foreign court must be reasonably comparable to the law of the Commonwealth.... We would grant that we might not enforce a foreign custody determination made in an arbitrary or capricious manner, even if the applicable law were comparable.
[Id., 468 N.E.2d at 255.]
The court enforced the Australian decree since the wife was provided with notice and was represented by counsel, and the *166 foreign order encompassed the same substantive law, i.e. "the best interests of the child." Ibid.
In Klont v. Klont, 130 Mich. App. 138, 342 N.W.2d 549 (1983), the plaintiff/husband was an American citizen whereas the defendant/wife was a West German citizen. The parties resided in Michigan where a child was born. Subsequently, they moved to Germany, where they remained together for eight months before separating. The wife filed for divorce and custody in a West German court and the husband was served with the papers and retained counsel. However, prior to the scheduled hearing date, the husband took the child and fled to Michigan. The West German court awarded custody to the wife. The husband instituted suit in Michigan, which was eventually dismissed on appeal since the West German decree warranted recognition by the Michigan courts. Although the UCCJA was not enacted in West Germany, the Klont court acknowledged that "even if the foreign jurisdiction has not adopted the act, so long as the foreign court's exercise of jurisdiction conforms with the criteria enumerated in the act" it is enforceable. Id., 342 N.W.2d at 550-51. Since the West German court had jurisdiction over the parties and the husband received notice but chose to flee the country rather than appear, the West German custody decree was entitled to enforcement.
Similarly, a Pennsylvania court accorded comity to a custody decree issued by an Israeli court since the wife received "reasonable notice of an opportunity to be heard at the Israeli proceedings [instituted by her husband], an opportunity she did not avail herself of." Hovav v. Hovav, 312 Pa.Super. 305, 458 A.2d 972, 974 (1983). Significantly, the children had been born in Israel and had spent most of their lives there; their only connection with Pennsylvania arose from their visit with their maternal grandparents in the state. The Hovav court deemed the children's connection to the state to have been "tenuous." Id., 458 A.2d at 975. But most importantly, comity was applied to the Israeli decree since that court had "heard testimony from witnesses who knew the children *167 and made its decision to further the best interests of the children." Id. at 974. Furthermore, since the Israeli court referred to both civil and religious law wherein there existed "an overwhelming principle which is the good of the child," the foreign decree was entitled to enforcement in Pennsylvania. Id. at 976.
In the present matter, the defendant does not provide a copy of the Gaza decree awarding him custody. This court has no knowledge as to whether the Sharia Court made specific findings as to what was in Nader's "best interests." However, it is revealing that the defendant submitted proof in support of his request for comity which indicates that under Muslim law, a father is automatically entitled to custody when a boy is seven (Article 391 of Islamic Sharia Law); the mother can apply to prolong custody until the boy is nine (Article 118 of the Law of Family Rights), however, at that time, the father or the paternal grandfather are irrebuttably entitled to custody. Such presumptions in law cannot be said by any stretch of the imagination to comport with the law of New Jersey whereby custody determinations are made based upon the "best interests" of the child and not some mechanical formula.
It is firmly established in New Jersey that in determining custody, the standard is the "best interest of the child." It has been noted that "[t]he uncontroverted and long standing acceptance of the application of the `best interest of the child' doctrine forms the basis of each and every custody decision in New Jersey." MC v. MC, 215 N.J. Super. 132, 139, 521 A.2d 381 (Ch.Div. 1986). In Beck v. Beck, 86 N.J. 480, 497, 432 A.2d 63 (1981), the New Jersey Supreme Court stated that "[t]he paramount consideration in child custody cases is to foster the best interests of the child. This standard has been described as one that `protects the safety, happiness and welfare of the child.' The happiness and welfare of the children shall determine the custody or possession." In addition, N.J.S.A. 9:2-4 provides that:
[t]he Legislature finds and declares that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after *168 the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy. In any proceeding involving the custody of a minor child, the rights of both parents shall be equal.
There is no mechanical presumption that either the father or the mother is entitled to custody at a fixed age. Thus, New Jersey's standard of the "best interest of the child" recognizes "that the paramount consideration is the safety, happiness, physical, mental and moral welfare of the child. Neither parent has a superior right to custody.... Each case is decided on its own facts and circumstances." Fantony v. Fantony, supra, 21 N.J. at 536-37, 122 A.2d 593.
In In Re Baby M, Chief Justice Wilentz indicated:
"Best interests" does not contain within it any idealized lifestyle; the question boils down to a judgment, consisting of many factors, about the likely future happiness of a human being.... Stability, love, family happiness, tolerance, and, ultimately, support of independence  all rank much higher in predicting future happiness than the likelihood of a college education.
[109 N.J. 396, 460, 537 A.2d 1227 (1988) (internal citation omitted).]
It has been acknowledged, both legally and by psychologists, that the psychological parentage relationship (bonding) is a primary factor in determining custody cases. This factor can even be used to award custody to a foster parent over a natural parent, where it will avoid psychological harm. Hoy v. Willis, 165 N.J. Super. 265, 398 A.2d 109 (App.Div. 1978). The bonding theory again is set out in Beyond the Best Interests of the Child, which indicates:
[F]or the child, the physical realties of his conception and birth are not the direct cause of his emotional attachment. This attachment results from day-to-day attention to his needs for physical care, nourishment, comfort, affection, and stimulation. Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his "psychological parent" in whose care the child can feel valued and "wanted."
[Joseph Goldstein et al., Beyond the Best Interests of the Child 17 (1979).]
Thus, a preference in custody cases is given to the parent with the strongest psychological bond with the child.
It has further been held and N.J.S.A. 9:2-4 specifically provides for the child's preference to be considered in a custody *169 determination and this is particularly relevant when the age of the child is considered. In Lavene v. Lavene, the court indicated that:
[t]he age of the child certainly affects the quantum of weight that his or her preference should be accorded, but unless the trial judge expressly finds as a result of its interview either that the child lacks capacity to form an intelligent preference or that the child does not wish to express a preference, the child should be afforded the opportunity to make [his or] her views known. We would think that any child of school age, absent the expressed findings as we have indicated, should have that opportunity and that the judge would be assisted thereby.
[148 N.J. Super. 267, 272, 372 A.2d 629 (App.Div.), certif. denied, 75 N.J. 28, 379 A.2d 259 (1977).]
However, as indicated in W.W. v. I.M., 231 N.J. Super. 495, 511, 555 A.2d 1149 (App.Div. 1989), the court stated: "A trial judge is not bound by a young child's preference to live with one parent over the other." The judge is only required to give "due weight to the child's preference;" the preference is a factor which the judge should consider along with all of the other relevant factors. Thus, stated preferences are not conclusive but must be considered in applications for modification.
In In re the Marriage of Malak, Hovav, Klont, and Custody of a Minor, as discussed supra, the courts recognized the foreign decrees since their decisions were based on an analysis and inquiry similar to that of the American jurisdiction and thus did not offend public policy. To the contrary, the defendant seeks to have this court place its imprimatur on a decree that is diametrically opposed to the law of New Jersey and which is repugnant to all case law concerning factors to be considered in making a custody determination.
Thus, for the foregoing reasons, the Sharia Court custody decree cannot be enforced or recognized by New Jersey courts under the doctrine of comity.

(3) "HOME STATE" OF NADER
The Superior Court of New Jersey has jurisdiction over child custody issues pursuant to N.J.S.A. 2A:34-31. In this particular instance, N.J.S.A. 2A:34-31 a(1)(ii) and -31 c empower this court to exercise jurisdiction since:

*170 This State ... had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State....
....
c. Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.
Prior to Nader's departure for Paris in July 1993, it is undisputed that he had completed both kindergarten and the first grade in the Elizabeth public school system. The stories diverge after the parties were reunited in Gaza on or about July 15, 1993. The plaintiff claims that she left Nader with the defendant in Gaza with the defendant's assurances that Nader would be returned to New Jersey in time to begin the second grade in Elizabeth. To the contrary, the defendant asserts that Nader's residence in New Jersey was always deemed to be temporary and that the plaintiff had agreed to permit Nader to reside in Gaza with his father as of July 1993. Putting aside these conflicting accounts, this court is satisfied that New Jersey was Nader's "home state" for the two (2) years prior to his departure in July 1993 for Paris and eventually Gaza. It was not until Nader was retained in Gaza past the agreed-upon return date that the plaintiff sought this court's assistance. As plaintiff has remained a resident of New Jersey, this court finds that the jurisdictional requirements of N.J.S.A. 2A:34-31 a(1)(ii) are satisfied thereby permitting a custody determination to be made in New Jersey.

(4) FORUM NON CONVENIENS
The defendant asserts that the tremendous burden of litigating this custody issue in New Jersey requires that the Sharia Court's decree be enforced. In support of his allegation that New Jersey is an inconvenient forum, the defendant sets forth various factors, such as, the travel restrictions imposed on Palestinian nationals, Nader's current enrollment in an Islamic school in Gaza, the residence of both defendant's family in Gaza and plaintiff's family on the West Bank, Gaza as the site of the marriage ceremony under Muslim law, the residence of the parties *171 in Gaza during the major portion of their marriage, the location of most witnesses in Gaza, and the plaintiff's unrestricted and frequent travels to Gaza.
To this effect, N.J.S.A. 2A:34-46 provides a procedure for reducing inconvenience and impossibility:
In addition to other procedural devices available to a party, any party to the proceeding or a guardian ad litem or other representative of the child may adduce testimony of witnesses, including parties and the child, by deposition or other form of sworn statement, in another state. The court on its own motion may direct that the testimony of a person be taken in another state and may prescribe the manner in which and the terms upon which the testimony shall be taken. (emphasis added).
Thus, the defendant may avail himself of these various forms of discovery and testimony. In addition, it is clear that the plaintiff resides in New Jersey, as does her mother, and Nader in addition to having resided in Elizabeth for the two years prior to July 1993 has attended the Elizabeth public schools during both kindergarten and the first grade. It can thus be reasonably expected that persons from New Jersey will be called upon to testify regarding Nader's relationship with his mother, how he has performed in school, and what his living accommodations are in New Jersey.
Notwithstanding the many factors supporting Gaza as the "most convenient" forum for the defendant, this court cannot sanction the Islamic law imposed by the Sharia Court, as represented to this court in the certifications of both the defendant and Raji Sourani, an attorney in Gaza and close friend of the defendant. As previously discussed, the law of the Sharia Court in regard to custody determinations offends the public policy of New Jersey.

CONCLUSION
Although the logistics appear daunting, this court cannot refuse to exercise its proper jurisdiction under the UCCJA as the "home state" of Nader. The law of the Sharia Court is undeniably arbitrary and capricious and cannot be sanctioned by this court, which uses the "best interest of the child" as the overriding concern. The procurement of a home evaluation in Gaza as well *172 as psychological evaluations of the parties and Nader may not be feasible or particularly simple; however, this court must order them. In child custody cases, a "plenary hearing is virtually a necessity ... unless there are overwhelming admitted facts (e.g., child abuse). Such a hearing must be held ... where serious and long standing effects on the life and well-being of the child may result." MC v. MC, supra, 215 N.J. Super. at 140, 521 A.2d 381. Accordingly, a plenary hearing to determine custody will be scheduled as soon as possible.
The attorney for the defendant shall prepare and submit an order in accordance with this decision within seven (7) days.
NOTES
[1] The substantial wealth of decisions concerning in personam jurisdiction involve economic transactions. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); World-Wide Volkswagen v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
[2] It has been recognized that the:

jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the domicile of the parents. It has its origin in the protection that is due to the incompetent or helpless, and our jurisdiction parens patriae is firmly established in our jurisprudence and is derived from common law, our case law and the statutes.
[Fantony v. Fantony, 21 N.J. 525, 535, 122 A.2d 593 (1956).]
[3] The plaintiff's father is Palestinian and her mother is Puerto Rican.
[4] Note that since Gaza is not a signatory to the Hague Convention on the Civil Aspects of International Child Abduction, the Convention's provisions are not an option.