685 A.2d 1319

JEAN JACQUES MARCEL IVALDI, PLAINTIFF–APPELLANT, v. LAMIA KHRIBECHE IVALDI, DEFENDANT– RESPONDENT.

Argued November 4, 1996—Decided December 23, 1996.

*Patricia E. Apy* argued the cause for appellant (*Paras, Apy & Reiss,* attorneys).

*Lamia Khribeche Ivaldi* submitted a letter in lieu of brief *pro se.*

The opinion of the court was delivered by

POLLOCK, J.

The primary issue is whether under the Uniform Child Custody Jurisdiction Act, *N.J.S.A.* 2A:34–29 to –52 ("the Act" or "the UCCJA"), New Jersey courts have subject-matter jurisdiction to determine this international child-custody dispute. A second issue is whether the courts of New Jersey provide a more convenient forum to resolve the issue of custody.

Plaintiff, Jean Jacques Marcel Ivaldi ("the father"), and defendant, Lamia Khribeche Ivaldi ("the mother"), are engaged in matrimonial actions in Morocco and New Jersey. Each seeks a divorce from the other and custody of the only child of their marriage, Lina Camille Ivaldi ("Lina" or "the child").

In February 1995, the mother removed the child from New Jersey, where the child had resided with both parents, to Morocco. The mother then instituted a proceeding in Morocco for divorce and custody of the child. Less than a week later, the father filed this action in the Superior Court of New Jersey, Family Part, seeking a divorce, equitable distribution, support, and sole custody of the child. The Family Part denied the mother's motion to dismiss the complaint.

The Appellate Division granted the mother's motion for leave to appeal and reversed, holding that the Family Part did not have subject-matter jurisdiction to entertain the father's claim for custody. 288 *N.J.Super.* 575, 672 *A.*2d 1226 (1996). It also held that principles of international comity required deference to the jurisdiction of the Moroccan court. *Id.* at 589, 672 *A.*2d 1226. We granted the father's petition for certification. 145 *N.J.* 372, 678 *A.*2d 713 (1996).

We hold that the jurisdictional provisions of the Act vest the Family Part with subject-matter jurisdiction to determine this custody dispute. We remand the matter to the Family Part for a determination whether New Jersey or Morocco provides the more appropriate forum. If the Family Part determines that Morocco

is the more convenient forum, it should dismiss the custody claim without prejudice.

## I.

From the limited record, we gather the following facts. In 1990, the mother, a Moroccan citizen, and the father, a citizen of both the United States and France, met while studying hotel and restaurant management in Switzerland. On September 18, 1992, they were married in Rabat, Morocco. Following the wedding, the couple resided in France. The father asserts that the couple had a civil wedding ceremony in France. According to the mother, the Moroccan ceremony was both religious and civil. She states that the purpose of the French ceremony was to assuage the father's French relatives. Lina was born in France on June 21, 1993.

The parties dispute the subsequent facts. The mother asserts that in October 1993 the couple moved with Lina to Rabat, Morocco, where they remained until the end of January 1994. The father claims that before the family moved to New Jersey Lina visited, but did not reside, in Morocco.

In January 1994, the father moved to New Jersey, where his parents operate a restaurant. A month later, the mother and Lina joined him. Following their move to New Jersey, the couple experienced substantial marital difficulties. The father eventually moved into his parents' house in Flanders, Morris County.

On February 22, 1995, the mother and father, each represented by counsel, entered into a comprehensive separation agreement. The agreement specifically states that the parents will share joint legal custody of Lina and that the mother will have physical custody. Significantly, the agreement expressly allows the mother, provided that she abides by all relevant terms of the agreement, to leave the United States with Lina and to reside in France or Morocco.

Under the agreement, the father is allowed twelve weeks of visitation per year with Lina. The agreement further requires the mother to permit Lina to travel to the country in which the father resides. Finally, the parties agreed that New Jersey law governs the terms of the agreement, and that they will incorporate the agreement into any divorce judgment. The agreement does not specify the jurisdiction in which any matrimonial action, including one seeking custody of the child, will proceed.

Within a week of signing the agreement, the mother sent Lina to live with the mother's parents in Morocco. The mother joined Lina a few weeks later.

On April 27, 1995, the mother filed an action for divorce and child custody in the Primary Court of Rabat in Morocco. On May 2, 1995, the father filed a complaint in the Superior Court seeking, among other things, sole custody of Lina. Pursuant to a court order, he served the mother by overnight mail on August 8, 1995. She filed a motion to dismiss several days later.

On September 29, 1995, the Family Part denied the mother's motion to dismiss. The court held that the Act did not apply, but that the court had subject-matter jurisdiction. Based on the child's residence in and substantial contacts with New Jersey, the court concluded that New Jersey was Lina's "home state" within the meaning of the Act. The trial court viewed the mother as holding the child "hostage."

The Family Part ordered the mother to return Lina to the United States within a week and temporarily awarded the father sole custody. It also restrained the mother from proceeding with her custody action in Morocco.

The Appellate Division granted a temporary stay and requested the Family Part to supplement its oral opinion with a written statement of reasons. In its opinion, the Family Part explained that the Act did not apply because the Moroccan court had not yet entered a custody order. Finding that Morocco has not yet signed the Hague Convention on the Civil Aspects of International Child

Abduction ("Hague Convention on Child Abduction"), the Family Part ruled that the Convention did not apply. The Family Part held that New Jersey was Lina's "home state" and that it had jurisdiction to determine the issue of custody. The court noted that when Lina left New Jersey, she had been a resident for more than one-half of her lifetime. Stating that the father believed the mother would return the child to New Jersey, the court found that the mother had removed Lina by "subterfuge."

The Appellate Division granted the mother's motion for leave to appeal and continued the stay of the Family Part's order. On March 15, 1996, the Appellate Division reversed. 288 *N.J.Super.* 575, 672 *A.*2d 1226 (1996). It found "no basis in the record for the Family Part judge's conclusion that [the mother] wrongfully removed Lina from New Jersey to Morocco. The separation agreement clearly contemplated that [the mother] would leave the United States with Lina and take up residence in another country." *Id.* at 581, 672 *A.*2d 1226. The Court continued:

> So too, the record is barren of anything supporting the judge's finding that [the mother] breached the agreement by denying [the father's] right of visitation. Although [the father] in his affidavit which accompanied his complaint alleged in conclusory fashion that he had not been permitted to visit Lina, it is undisputed that he never made any support payments as required by the agreement. He also neither tendered nor offered to tender travel expenses, a precondition to his right of visitation, until April 17, 1995.

> [*Id.* at 581–82, 672 *A.*2d 1226.]

The Appellate Division also held that the Family Part did not have subject-matter jurisdiction. It deemed the Act inapplicable, reasoning that the Act focuses on avoiding jurisdictional conflict between the courts of different states, not of different countries. *Id.* at 583, 672 *A.*2d 1226. The court then turned to *N.J.S.A* 2A:34–51, the section of the Act treating international custody disputes. It construed the section as conferring jurisdiction only when a New Jersey court is asked to enforce a custody decree entered by the authorities of a foreign country. *Id.* at 584, 672 *A.*2d 1226.

The Appellate Division held further that no federal statute conferred subject-matter jurisdiction on the Family Part. The

court declined to apply the Hague Convention on Child Abduction, noting that Morocco had not signed the Convention. *Id.* at 587, 672 *A.*2d 1226. In addition, the court found inapplicable the Parental Kidnapping Prevention Act ("the PKPA"). It reasoned that the PKPA concerned the enforcement in one state of decrees entered by the courts of another state, not those of another country. *Id.* at 588, 672 *A.*2d 1226.

Finally, the Appellate Division held that even if the Family Part had subject-matter jurisdiction, principles of international comity mandated deference to the Moroccan court. *Id.* at 589, 672 *A.*2d 1226. The court held that the Moroccan courts could fairly resolve the issue of custody in accordance with the best interests of the child. *Ibid.*

At oral argument before us, the father's counsel stated that the parties are participating in mediation in the Moroccan proceeding. In that proceeding, the father is represented by counsel and is actively contesting the mother's claim to custody of Lina. By comparison, the mother is not represented by counsel before this Court.

## II.

To determine whether the Act applies, we begin with its terms. The Act vests the Superior Court with jurisdiction to make a child-custody determination in a variety of circumstances. For example, the court has jurisdiction if New Jersey is the "home state" of the child, if the child and at least one parent have "significant connections" with New Jersey, or if no other state is the home state or has significant connections with the child and his or her parents. *N.J.S.A.* 2A:34–31(a)(1)–(4).

At first glance, the statutory language suggests that the Act applies to custody disputes between residents of different states and not to such disputes when one party resides in a foreign country. The Act describes the jurisdiction of the Superior Court in relation to the jurisdiction of other "states." In addition, the legislative findings assert that the Act's purpose is to avoid

jurisdictional competition and conflict with courts of other "states." *N.J.S.A.* 2A:34–29. The Act defines "state" as "any state, territory, or possession of the United States, the Commonwealth of Puerto Rico, and the District of Columbia." *N.J.S.A.* 2A:34–30(j). That definition does not expressly include other countries.

*N.J.S.A.* 2A:34–51, entitled "International application," adds meaning to the definition of "state." This section extends the "general policies of [the Act] to the international area." *N.J.S.A.* 2A:34–51. Thus, read as a whole, the Act applies to foreign countries as if they were states.

■ That conclusion comports with the central policy of the Act's jurisdictional provisions, which is to assure that custody litigation occurs in the place where the child and his or her family have the closest connection. *N.J.S.A.* 2A:34–29(c); *Neger v. Neger*, 93 *N.J.* 15, 25–26, 459 *A.2d* 628 (1982). The policy applies when, as here, one parent has removed the child to another country after having resided in New Jersey for a substantial period of time with the other parent.

The comments by the original drafters of the Uniform Act support this interpretation. For example, the comment to UCCJA § 23, which is identical to *N.J.S.A.* 2A:34–51, states that the Act's general policies, as delineated in UCCJA § 1 (*N.J.S.A.* 2A:34–29) "are to be followed when some of the persons involved are in a foreign country or a foreign custody proceeding is pending." One of the general purposes of the Act is to assure that custody litigation proceeds in the state where the child and the child's family have the closest connections and where significant evidence concerning the child's care, protection, training, and personal relationships is most readily available. *N.J.S.A.* 2A:34–29(c). Theoretically, New Jersey might be this "state," even if one parent or the parent and the child live in a different country.

In holding that the Act did not provide the Family Part with subject-matter jurisdiction, the Appellate Division relied on

*Schmidt v. Schmidt,* 227 *N.J.Super.* 528, 548 *A.*2d 195 (App.Div. 1988), and *Roszkowski v. Roszkowska,* 274 *N.J.Super.* 620, 644 *A.*2d 1150 (Ch.Div.1993). *Schmidt,* however, concerned that part of *N.J.S.A.* 2A:34–51 that specifically allows New Jersey courts to enforce a foreign custody decree. *Schmidt, supra,* 227 *N.J.Super.* at 533, 548 *A.*2d 195. The *Schmidt* opinion did not focus on the issue before us, whether the courts of New Jersey may entertain an international child-custody dispute when a concurrent custody proceeding is pending in another country.

In *Schmidt,* the father sued in New Jersey to enforce an ex parte West German custody order. *Id.* at 529–30, 548 *A.*2d 195. The Family Part denied the father's request for enforcement of the order because he had not served the mother with process in the West German proceeding. *Id.* at 531, 548 *A.*2d 195. The Family Part also denied the father's motion to transfer the case to West Germany. *Ibid.* The Appellate Division affirmed, holding that the Act did not require a transfer. *Id.* at 533, 548 *A.*2d 195. It reasoned that the father, without notice to the mother, had obtained the West German decree in violation of *N.J.S.A.* 2A:34–51. *Ibid.* Confronted with the request to enforce the West German decree, the Appellate Division stated that the "UCCJA applies only to an international custody case when the State is asked to recognize and enforce custody decrees of foreign countries." *Ibid.*

Relying on that statement, the Family Part in *Roszkowski, supra,* 274 *N.J.Super.* at 629, 644 *A.*2d 1150, held that the Act did not vest it with original jurisdiction to determine a custody dispute concerning a child who had been removed to Poland. Unlike *Schmidt, Roszkowski* did not involve enforcement of a foreign decree. *See also Loos v. Manuel,* 278 *N.J.Super.* 607, 621, 651 *A.*2d 1077 (Ch.Div.1994) ("The existence of [a German custody decree] is highly important, if not indispensable, to a claim under the Act's international provisions.").

*Schmidt* need not be read as restrictively as *Roszkowski* suggests. First, *Schmidt* did not concern the question whether the

Act vests the Family Part with original subject-matter jurisdiction. *Schmidt* dealt solely with the enforcement of an order from a foreign country. Thus, the statement suggesting that the Act does not vest the courts with original subject-matter jurisdiction was dicta.

Second, creating a distinction between the exercise of original jurisdiction and enforcement of a foreign decree would ignore the terms of *N.J.S.A.* 2A:34–51, which provides:

> The general policies of this act extend to the international area. The provisions of this act relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature and to custody rendered by appropriate authorities of other nations, if reasonable notice and opportunity to be heard were given to all affected persons.

The first sentence of the section extends all of the Act's general policies "to the international area." The second sentence requires New Jersey courts to recognize foreign custody decrees issued by similar "legal institutions" in the same manner as the courts would recognize decrees of other states, provided those institutions have accorded affected persons notice and the opportunity to be heard. The statutory language reflects the Legislature's uncertainty about the nature of foreign legal institutions. It counsels courts to verify that those institutions have proceeded in a manner consistent with the requirements of fundamental due process. Subject to those qualifications, the statute recognizes that the Act applies to international child-custody disputes.

Judicial recognition of foreign custody decrees comports with the reality that nations are drawing closer together. Information, capital, and goods daily cross international boundaries. People likewise travel regularly from country to country. National boundaries no longer prevent people from meeting or marrying. Sometimes those marriages will end in divorce and custody disputes. International child-custody actions have become part of a global society.

With increasing frequency, state courts may confront custody disputes arising from families comprised of citizens of different countries. When resolving those disputes, a court may harbor

doubts about the law of another country, particularly when that country's legal system, culture, religion, and language differ from ours. Notwithstanding those doubts, the courts of another country may provide a more convenient forum for determining custody.

Through *N.J.S.A.* 2A:34–51, the Legislature has extended the Act's policies to the determination of jurisdictional questions in international custody cases. Those policies include the importance of the identification of the "home state" and the need to avoid jurisdictional conflicts.

The majority of state courts that have considered the issue have held, either explicitly or implicitly, that the term "state" may include a foreign nation. Those courts have reached that conclusion notwithstanding that relevant statutes uniformly define "state" as "any state, territory, possession of the United States, the Commonwealth of Puerto Rico, and the District of Columbia." *See, e.g., Zenide v. Superior Court,* 22 *Cal.App.*4th 1287, 27 *Cal.Rptr.*2d 703, 706 (Ct.App.1994) (holding that France is "home state"); *Stock v. Stock,* 677 *So.*2d 1341, 1345 (Fla.Dist.Ct.App. 1996) (finding that UCCJA applies to international custody dispute between Switzerland and Florida); *Horlander v. Horlander,* 579 *N.E.*2d 91, 94 (Ind.Ct.App.1991) (ruling that UCCJL applies to determine whether Indiana or France is "home state"); *McFaull v. McFaull,* 560 *So.*2d 1013, 1014 (La.Ct.App.1990) (holding that extension of UCCJA to international area authorizes treatment of Leningrad as state under jurisdictional provisions of the Act); *Abu–Dalbouh v. Abu–Dalbouh,* 547 *N.W.*2d 700, 704 (Minn.Ct. App.1996) (finding that UCCJA applies to international custody disputes); *Black v. Black,* 441 *Pa.Super.* 358, 657 *A.*2d 964, 970 (1995) (holding that foreign country may be considered "home state" for purposes of UCCJA); *Adkins v. Antapara,* 850 *S.W.*2d 148, 151 (Tenn.Ct.App.1992) (holding that home-state analysis may be used when deciding jurisdiction as between state and foreign nation); *Middleton v. Middleton,* 227 *Va.* 82, 314 *S.E.*2d 362, 368 (1984) (holding that England is equivalent of statutory "home state"). *But see Klien v. Klien,* 141 *Misc.*2d 174, 533 *N.Y.S.*2d

211, 214 (Sup.Ct.1988) (holding that Israel cannot be considered "home state" within definition of statute). Such a holding further accomplishes the general purposes of the Act, including the fundamental policy of using the home-state analysis to decide jurisdiction. *See Adkins, supra,* 850 *S.W.*2d at 151; *Middleton, supra,* 314 *S.E.*2d at 368; *see also* Linda Silberman, *Hague International Child Abduction Convention: A Progress Report,* 57 *Law & Contemp. Probs.* 209, 249 n. 199 (1994) (stating that in international cases "[t]he principles of the UCCJA may be used to locate the litigation in the child's home state and/or enforce a foreign decree").

Two courts have held that "state" does not include a foreign country. In those states, however, the legislatures have adopted a version of the UCCJA that omits the counterpart to *N.J.S.A.* 2A:34–51. *See State ex rel. Rashid v. Drumm,* 824 *S.W.*2d 497, 503 (Mo.Ct.App.1992) ("Since Missouri has not adopted [the international application section] of the UCCJA, it is clear that the legislature did not intend the word 'state' as used in [the jurisdictional section] to include a foreign country."); *Schroeder v. Vigil–Escalera Perez,* 76 *Ohio Misc.*2d 25, 664 *N.E.*2d 627, 636–37 (Com.Pl.1995) ("While some states have extended the general policies of the UCCJA to the international arena, Ohio has not promulgated similar provisions in its adoption of the UCCJA."). The absence of a provision extending the UCCJA to international disputes is crucial.

Our holding conforms also with a proposed revision of the UCCJA, entitled the Uniform Child Custody Jurisdiction and Enforcement Act ("the UCCJEA"), which is under consideration by the National Conference of Commissioners on Uniform State Laws. *Unif. Child Cust. Jur. Enf. Act* (1996) (draft). The proposed UCCJEA explicitly states that all of its provisions apply to child custody proceedings of other countries, including the juris-

dictional determination of home-state priority.[1] In sum, we conclude that the Legislature intended the Act to apply to international child-custody litigation.

### III.

Having determined that the term "state" includes foreign countries and that the jurisdictional provisions of the Act apply to international custody disputes, we now consider whether the Family Part has subject-matter jurisdiction. We begin by recognizing that New Jersey was the home state of the child at the time that the father commenced this proceeding.

*N.J.S.A.* 2A:34–30(e) defines a "home state" as the state where the child lived with one or both parents at least six months before the custody suit began. Lina lived in New Jersey with both of her parents from the time she was approximately eight months old until she was approximately one year and nine months old. Thus, she resided here for thirteen consecutive months, more than twice the six-month statutory requirement. New Jersey was Lina's home state.

The Act specifically vests the Family Part with jurisdiction when New Jersey is the child's home state within six months before the commencement of the proceeding, the child is absent from New Jersey because he or she has been removed by a person claiming her custody, and one parent continues to live in New Jersey. *N.J.S.A.* 2A:34–31(a)(1). The facts satisfy these jurisdictional prerequisites. New Jersey was Lina's home state within six months before the proceeding. She left for Morocco only two months before her father filed the present action. Her mother, who also seeks custody, removed Lina from New Jersey to Morocco. The father remains a New Jersey resident.

---

[1] The current draft of section 103 of the UCCJEA states: "The provisions of this [Act] apply to child-custody proceedings and determinations of other countries rendered by appropriate authorities if there is reasonable notice and opportunity to be heard."

■ Thus, New Jersey was Lina's home state at commencement of this proceeding even if, as the mother argues, Lina had lived in Morocco for three months before moving to New Jersey. Finally, the father's contention that the mother wrongfully removed Lina from New Jersey does not predetermine the issue whether the Family Part has subject-matter jurisdiction.

## IV.

■ We conclude that New Jersey is the child's "home state" and that the Family Part has jurisdiction. Those conclusions do not necessarily resolve the jurisdictional conflict that arises when another court exercises original jurisdiction in a concurrent custody proceeding. Remaining is the question whether "the child and [her] family have a closer connection with another state [or country]." *N.J.S.A.* 2A:34–29(c). If so, the courts of New Jersey should defer to the more convenient forum. *Id.; see, e.g., D.B. v. R.B.*, 279 *N.J.Super.* 405, 412, 652 *A.*2d 1254 (App.Div.1995) (holding that even if trial court had jurisdiction, Virginia was more appropriate forum); *In re Adoption of Child by T.W.C.*, 270 *N.J.Super.* 225, 236, 636 *A.*2d 1083 (App.Div.1994) (finding that trial court did not abuse its discretion by denying plaintiffs' motion to dismiss because New Jersey, not New York, was more appropriate forum).

■ In the Appellate Division, the mother argued for dismissal on forum-non-conveniens grounds. Without deciding the issue, the Appellate Division held that the Family Part, even if it had jurisdiction, should defer to the Moroccan court. The court reached this result relying not on principles of forum-non-conveniens, but of international comity. *Ivaldi, supra,* 288 *N.J.Super.* at 589, 672 *A.*2d 1226.

The better procedure is to decide the forum-non-conveniens issue under the provisions of the Act. Hence, we remand the matter to the Family Part to determine whether Morocco or New Jersey provides the more convenient forum. Essential to that determination is *N.J.S.A.* 2A:34–35, which states that a court

should "consider if it is in the interests of the child that another state assume jurisdiction." *N.J.S.A.* 2A:34–35(c). For this purpose, the Family Part may consider, among other things, whether Morocco has a closer connection with Lina and her mother; whether substantial evidence concerning Lina's present or future care, protection, training, and personal relationships is more readily available in Morocco; and whether the Family Part's exercise of jurisdiction would contravene any of the purposes of the Act. *Ibid.*

The interests of the child are critical in determining which jurisdiction provides a more convenient forum. *Ibid.* Lina has lived in Morocco for approximately nineteen months since her father filed this action. She is now over three years old and presumably has established significant connections with Morocco. Furthermore, her mother and her maternal grandparents also reside in Morocco. Finally, the father is represented by counsel in Morocco and is participating in the Moroccan proceedings.

We encourage the Family Part to communicate directly with the Moroccan court to obtain any information needed to determine whether New Jersey or Morocco is the more convenient forum. *N.J.S.A.* 2A:34–35(d). If language differences pose a problem in communication, the Family Part may obtain an interpreter through the vicinage trial-court administrator. Communication between courts furthers the goals of the Act by permitting the exchange of information so that the court best situated to consider the interest of the child will determine the question of custody. *N.J.S.A.* 2A:34–29(b), (h).

If the Family Part dismisses this action, the dismissal will not preclude a New Jersey court from subsequently reviewing the enforceability of the Moroccan custody decree. For example, if the Moroccan court denies the father procedural due process or refuses to consider Lina's best interests, the Family Part may then refuse to enforce the Moroccan decree. *See Ali v. Ali,* 279 *N.J.Super.* 154, 164–67, 652 *A.*2d 253 (Ch.Div.1994) (declining to recognize Gaza decree because no notice was given to mother and

because Sharia Court did not apply best-interests-of-the-child test).

In addition to noting the Hague Convention on Child Abduction, *supra* at 196, 685 *A*.2d at 1322, we also note the recently negotiated Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation In Respect of Parental Responsibility and Measures For the Protection of Children ("Hague Convention on Jurisdiction"). Understandably, the drafters of the Hague Convention on Jurisdiction have sought to coordinate it with the Convention on Abduction. Both conventions, for example, employ the concept of "habitual residence."[2] We need not make a detailed comparison of the two conventions. For our purposes, it suffices to observe that the Hague Convention on Jurisdiction further explains the application of comity principles to international custody disputes.

Morocco is the only country that has signed the October 19, 1996 draft of the Hague Convention on Jurisdiction. The United States has not yet signed the Convention, but in the Final Act of the Eighteenth Session on October 19, 1996, our delegates agreed to submit the Convention to this country's government. Although the Convention has not yet taken effect, it provides helpful guidance in arriving at a fair and reasonable resolution of this matter.

The Hague Convention on Jurisdiction addresses various aspects of the protection of children, including custody. It begins by "[c]onfirming that the best interests of the child are to be a primary consideration." Hague Convention on Jurisdiction, Oct.

---

[2] *See, e.g.,* Hague Convention on Child Abduction, *S. Treaty Doc. No. 11*, 99th Cong., 1st Sess., 19 I.L.M. 1501 (1980) (stating that Contracting States desire "to protect children from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence"); Hague Convention on Jurisdiction, Oct. 19, 1996, art. 7 ("In case of wrongful removal or retention of the child, the authorities of the Contracting State in which the child was habitually resident immediately before the removal or retention keep their jurisdiction until the child has acquired a habitual residence in another State.").

19, 1996 (preamble). Among the objects of the Convention are "to determine the State whose authorities have jurisdiction to take measures directed to the protection of the person or property of the child" and "to establish such co-operation between the authorities of the Contracting States as may be necessary in order to achieve the purposes of this Convention." *Id.* at art. 1. Article 23 states that the courts of one country need not recognize a custody decree issued by the courts of another country if the decree contravenes the fundamental principles of procedure or the public policy of the country in which recognition of the decree is sought.[3]

We trust, however, that the Moroccan court will consider the child's best interests in fashioning a custody order. In that regard, the Hague Convention on Jurisdiction seeks to assure that the best interests of the child is the primary consideration in all international disputes involving children. *See id.* at art. 8, 9, 23. We trust further that the Moroccan court will consider the parties' separation agreement, including its provision calling for the application of New Jersey law. Our goal is to further the purposes of the Act and of the Hague Convention on Jurisdiction by avoiding jurisdictional competition while simultaneously discouraging parents from unilaterally removing their children to obtain a more favorable forum.

---

[3]       Chapter IV—RECOGNITION AND ENFORCEMENT

Article 23

\*   \*   \*   \*   \*   \*   \*   \*

II.  Recognition may however be refused

\*   \*   \*   \*   \*   \*   \*   \*

b.  if the measure was taken, except in a case of urgency, in the context of a judicial or administrative proceeding, without the child having been provided the opportunity to be heard, in violation of fundamental principles of procedure of the requested State;

c.  on the request of any person claiming that the measure infringes his or her parental responsibility, if such measure was taken, except in a case of urgency, without such person having been given an opportunity to be heard;

If the Family Part dismisses the father's claim for custody, it should inform the Moroccan court of its decision. *N.J.S.A.* 2A:34–35(h). The Family Part should also consider whether to dismiss the father's other requests for relief.

The judgment of the Appellate Division is reversed and the matter is remanded to the Family Part.

*For reversal and remandment*—CHIEF JUSTICE PORITZ and JUSTICES HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.

---

d.  if such recognition is manifestly contrary to public policy of the requested State, taking into account the best interests of the child;