830 A.2d 929 (2002)
363 N.J. Super. 53
Mansur MAQSUDI, Plaintiff,
v.
Gulnara KARIMOVA MAQSUDI, Defendant.
Superior Court of New Jersey, Chancery Division, Morris County.
Decided September 12, 2002.
*930 Edward J. O'Donnell, for plaintiff (Cutler, Simeone, Townsend, O'Donnell and Tomaio, attorneys), Morristown and Beatrice Kandell, Livingston, for plaintiff (Skoloff and Wolfe, attorneys).
*931 John Paone, Woodbridge, for defendant (Paone & Zaleski, attorneys).
WILSON, D., J.S.C.
The threshold issue in this international child custody and marital dissolution case is whether or not this court has subject matter jurisdiction to determine child custody and parenting issues, given that the mother and the two minor children of the marriage are currently residing in Tashkent, Uzbekistan, where the family had spent the majority of the last two years. The father had worked on a special assignment, while maintaining the permanent family home in Morris County, New Jersey. A second issue concerns whether or not this court should enforce an Uzbek custody decree obtained by the mother after her removal of the children from the State of New Jersey. This court determines that it does have subject matter jurisdiction under the Uniform Child Custody Jurisdiction Act, N.J.S.A. 2A:34-28 et. seq. This court also determines that it will not enforce the Uzbek divorce decree because the father was not afforded fundamental indicia of due processnotice and the opportunity to be heard.

I.
Plaintiff, Mansur Maqsudi, emigrated with his parents and siblings from Afghanistan to the United States in 1979, when he was 12 years old. He attended elementary and secondary schools in Morris County and college in Rhode Island. In 1989 he became a U.S. citizen. After college, he began work in the family business in New York City.
In 1991, Mr. Maqsudi visited Uzbekistan for the first time and met defendant, Gulnara Karimova, at a party at the home of her father, then and currently the President of Uzbekistan, a republic formed in Central Asia shortly after the break-up of the Soviet Union. The parties dated for six months prior to their marriage, a religious ceremony in Uzbekistan in November 1991 and a civil ceremony in New York City in December 1991. Prior to their marriage ceremonies, they had discussed the importance to Mr. Maqsudi of educating their children in the United States and living in the United States, particularly because of the difficulties he had encountered in relocating to the United States at the age of 12.
After the wedding, they resided together in Weehawken, New Jersey, where they continued to live until May 1993, when they finished their home in Montville, New Jersey. During this period of time, Ms. Karimova obtained her green card and a visa to remain in the United States.
Their son, Islam, an American citizen, was born in December 1992, while the couple was living in Weehawken. They all moved to Montville in 1993 because of the excellence of the school system and because they had literally dozens of close family members in Morris County.
Mr. Maqsudi continued to work for his family's business in New York City and commuted from Montville. Within a month after they had moved into the Montville home, however, the business required him to spend substantial amounts of time in Uzbekistan on a special project. The parties kept the Montville home and traveled back and forth from Uzbekistan with Islam. When in Uzbekistan, they stayed with Ms. Karimova's father. During this time, they did not have their New Jersey mail forwarded; they did not change their drivers' license addresses; they did not change their passport addresses; and they continued to file tax returns in the United States and New Jersey. Islam started pre-school in Montville, engaged in various extracurricular activities in that area, and continued his *932 close relationships with his many aunts, uncles, and cousins. In June 1998, the Maqsudis' daughter, Iman, an American citizen, was born in the Meadowlands Hospital in Secaucus, New Jersey, while they were living in New Jersey.
From 1993 to 1998, the family had traveled back and forth between Uzbekistan and their home in New Jersey. Mr. Maqsudi's specific charge was to set up a management team in Tashkent to manage the family business projects in Uzbekistan and then to return to the United States. The team was sufficiently in place by 1998; and they returned to Morris County at that time.
In fall 1998, they both decided to pursue graduate degrees at Harvard College. They sold the Montville home, rented a home in Newton, Massachusetts, and almost immediately began searching for a new home in New Jersey, larger and more secure, to serve as their family home after their respective Harvard graduations, Mr. Maqsudi's in June 1999 and Ms. Karimova's in June 2000.
Despite the family's peripatetic lifestyle, the children seemed to be centered in the United States, with their primary physicians and schools being either in New Jersey or in Massachusetts, and their close family relationships being in Morris County, New Jersey. Despite Mr. Maqsudi's business interests, it appears that he was a primary caretaker of the children, taking them to those doctors' appointments, extracurricular activities and school events.
While at Harvard, the parties looked for their next home in the Mendham, Montville, Boonton, and Mountain Lakes areas of Morris County. They looked for a home in those areas primarily because of the reputations of the school systems for their children and secondarily because of the proximity of Mr. Maqsudi's family. In May 1999, they signed a contract on a large and luxurious home in Mendham. They closed on August 1, 1999, and moved in. The house was lavishly furnished and the parties moved in with Mr. Maqsudi planning to work in the New Jersey office of the family's business. Ms. Karimova planned to complete her Harvard degree research in New Jersey away from the Harvard campus.
The manager of the Maqsudi business in Uzbekistan resigned unexpectedly in 1999, however. This situation compelled Mr. Maqsudi again to return to Tashkent to set up another management team. The parties considered Mr. Maqsudi's traveling to Tashkent and leaving the family behind, but decided otherwise because of Iman's tender age. So the parties journeyed together once again to Tashkent, where Islam began first grade in the American International School. That school was essentially a school for transient, principally American, children, whose parents were temporarily stationed in Tashkent. Islam took various courses, all of which were taught in English, and participated in the school's American curriculum. The Maqsudis thought they would be able to return to the United States after a few months, or a year at the most, and wanted Islam to be able to go right back into U.S. schools, without an educational disruption. Islam attended the school for the 1999-2000 school year but missed many days because of journeying back and forth to the United States.
While still in Uzbekistan in early 2000, the parties began renovation of the Mendham home. The negotiations with contractors had started in late 1999. They finished the basement for the children, painted the entire house, refurnished the house and, essentially, made it more comfortable for the children. The parties were adamant that the renovations be completed by the end of March 2000 because *933 they contemplated living there on a full-time basis shortly after that time.
They were, however, unable to return home on a full-time basis, even at the end of the 1999-2000 school year. Mr. Maqsudi was close to putting his management team in place but it was not quite ready; so they decided to re-enroll Islam in the American International School for the 2000-2001 school year.
Since Mr. Maqsudi's 1999 Harvard graduation, the children had been in Mendham only for the long school breaks at Christmas and summer vacations, in addition to several sporadic trips during the school year. Upon their returns to Mendham, the parties took the children, among other things, for various medical and dental checkups. The physicians for all the parties were in Morris County during this entire period, with the exception of sporadic doctor visits in Tashkent, when the children were seen by the President's in-house doctors. And, of course, the children and their parents spent substantial time visiting with the many aunts, uncles, and cousins in Morris County.
Finally, the Uzbek management team fell into place during early 2001 and the parties returned to Mendham to stay full-time in early July. Islam was not re-enrolled in the American International School. While Islam had not been enrolled in the Mendham school system by the end of July, both parties evidenced their intention to do so in conversations with various family members during gatherings in the month of July. There was no evidence of any intent to leave Mendham, except for a brief visit to Tashkent in August, two weeks prior to the start of school in Mendham.
On July 28, 2001, however, the parties had an argument that would change the course of their lives forever. They had been having serious arguments for the past few days; and, finally, Ms. Karimova cornered Mr. Maqsudi in one of the lower level rooms of their home with two of the security guards assigned to her because of her status as the daughter of the President of Uzbekistan. Apparently, the argument was extremely loud because Islam became frightened and came running into the room. Mr. Maqsudi tried to walk away but was restrained by the security guards. With the security guards in front of him and Islam behind him, he decided that this had gone far enough. He told his wife that things had gone too far and asked her for a divorce. Initially, she did not believe him but, then, apparently did. He left the house so as to not make things more difficult for the children, intending to return when his wife had regained her composure.
When he returned home later that afternoon, his wife was not there and he found notes from her. He remained in the house for several hours, playing with the children; but he did not remain overnight, leaving the two children with their two nannies and the security guards.
The next morning, July 29, 2001, he returned home and played with the children for the morning, while his wife slept. He left before she awakened and returned to his parents' home. When he checked his phone messages later that day, he found a message from his wife, informing him that she was at the airport and that there was a new message for him at the house. He went to the house to get the children; they were gone, leaving behind all of their possessionsfavorite toys, clothing, piggy banks, etc. Ms. Karimova had left for Tashkent with the children and her entourage.
Then began weeks of attempting to locate the children and his wife. Mr. Maqsudi soon learned that his parents, *934 uncles and employees in Uzbekistan were being harassed by government officials. His relatives were regularly taken from their homes in the middle of the night, questioned and returned to their homes in the morning. The family business interests in Tashkent were taken over by the government, ostensibly for currency regulation violations. He sought diplomatic, personal, and political avenues for aid in locating and providing for the return of the children. He attempted to reach his wife by calling various Uzbek phone numbers, including those at the residence of his father-in-law, the President. All was in vain. Mr. Maqsudi was unable even to speak with his wife by phone.
Finally, on September 14, 2001, six weeks after the children were taken to Uzbekistan, Mr. Maqsudi did have a phone conversation with his wife. During that conversation, and numerous others during the next three months, she made various threats and demands with regard to their divorce issues. He agreed to the demands, on the condition that his relatives be freed and his children returned. She refused to meet his conditions and communications broke down permanently in mid-December 2001.
Shortly after that last contact, 24 members of the Maqsudi family were exported in the middle of the night to the Uzbek-Afghan border. Two other family members were sentenced to lengthy prison terms for currency and tax regulation violations.
Except for a brief conversation with Islam in early 2002 and a brief conversation with his wife and Islam during the course of proceedings in this case in August 2002, Mr. Maqsudi has not been able to speak with his family.

II.
Meanwhile, apparently on August 13, 2001, two weeks after she had left New Jersey, Ms. Karimova filed a petition for divorce and custody of the children in the Mirabad District Court of Uzbekistan. No copy of the summons or petition has been produced, even though service of both upon a defendant is required under Uzbek law. The only related documents produced were postal office receipts for delivery of notices of unidentified proceedings; and none of the receipts indicate clearly the identity of the recipient. The first of these was apparently generated on September 24, 2001 and mailed on September 26, 2001, noticing a proceeding on September 28, 2001. That notice was purportedly sent to Mr. Maqsudi, but the address was incomplete, listing an unknown address in Tashkent.[1]
Nonetheless, a proceeding took place on September 28, 2001 in Tashkent. A transcript of the proceeding was introduced, by which it appeared that return receipts of service were contained in the court filesa questionable accomplishment, given that the notice had been posted only two days prior to the proceeding itself. The transcript of the proceeding also reveals that Ms. Karimova had testified that she did not know the whereabouts of Mr. Maqsudi and that she had been attempting to notify him of the hearing. She testified also that she had informed him of the divorce and that he was waiting for the decision. This testimony belies the numerous conversations (most of which had been recorded by Mr. Maqsudi) that had occurred between the two during the last two weeks of September, indicating that Ms. Karimova knew full well Mr. Maqsudi's location. Knowing his location, namely, New Jersey, *935 she also knew that he could not possibly have received notices of the proceedings, even had they been addressed correctly. She also failed to inform him of the pendency of the divorce action in Tashkent.
The Tashkent court ordered that the proceedings be adjourned to a later date in order to allow Mr. Maqsudi to appear. A second set of three notices was purportedly issued on September 28 and posted on September 26 [sic] for a hearing on October 5, 2001. Those notices were also addressed to such places and in such an incomplete manner that they could not have been received by Mr. Maqsudi or his agents. A third set of inadequately addressed notices was posted on October 3, 2001.
A second proceeding ensued on October 5, 2001, during which Ms. Karimova, in contradiction of her prior testimony, told the court that she had not been in contact with her husband since July 28 and that he was reluctant to appear due to an upcoming tax audit. Again, the clerk of the court referred to proofs of service, none of which have been produced, except for the ones described above.[2] The October 5, 2001 proceeding granted a divorce to Ms. Karimova, providing her custody of the two children as well. While the "best interest of the child" is the standard for custody proceedings in Uzbekistan, as in the United States, there were no findings in that regard made during the course of the proceeding. That, however, may have been the result of the fact that it appeared to the court that the hearing was uncontested.
The Uzbek divorce decree was never properly served on Mr. Maqsudi.

III.
Having no knowledge of the proceedings in Uzbekistan, Mr. Maqsudi filed a complaint for dissolution, equitable distribution and custody of his children in the Superior Court of New Jersey, Morris County, on October 15, 2001. On November 1, 2001, an order was entered, pursuant to an Order to Show Cause, granting Mr. Maqsudi pendente lite custody of Islam and Iman. A copy of the summons and complaint was duly served on Ms. Karimova pursuant to court order of October 15, 2001.
On December 13, 2001, no answer to the complaint having been filed, Mr. Maqsudi moved to enter default. On March 18, 2002, Ms. Karimova filed a motion requesting that default be vacated, that the custody order be vacated, that the complaint be dismissed on the grounds of lack of subject matter jurisdiction and res judicata, and alternatively, that default be vacated and that she be permitted to respond to her husband's complaint. Mr. Maqsudi opposed the motion, seeking enforcement of his custody order and the return of his children to New Jersey. At oral argument, the court provided for discovery and a plenary hearing.
Pursuant to that order, a plenary hearing was held over the course of 14 trial days. Ms. Karimova, despite this court's *936 stay of any orders or sanctions against her and this court's exhortations to appear, chose not to appear. The court did afford her, however, the opportunity to present expert witnesses on the jurisdictional and res judicata issues. She presented two such experts; Mr. Maqsudi presented one expert; and the court ordered an appearance and report by its own expert.

IV.
This examination of subject matter jurisdiction over child custody and parenting issues must begin with the Uniform Child Custody Jurisdiction Act, N.J.S.A. 2A:34-28 et seq.[3] The two main purposes of the Act are the avoidance of competition between various states and the discouragement of parents from unilaterally removing children to obtain a more favorable forum. Ivaldi v. Ivaldi, 147 N.J. 190, 207, 685 A.2d 1319 (1996); N.J.S.A. 2A:34-29. It is beyond cavil that the Act applies to jurisdictional issues between states of the United States, as well as between states of the United States and foreign countries. Ivaldi, 147 N.J. at 198-99, 685 A.2d 1319.
N.J.S.A. 2A:34-31 sets forth the various jurisdictional bases of the Act.[4] A court of this state will have jurisdiction to make a child custody determination by initial or modification decree if
(1) This State (i) is the home state of the child at the time of the commencement of the proceeding, or (ii) had been the child's home state within 6 months before the commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State; or
(2) It is in the best interest of the child that a court of this State assumes jurisdiction because (i) the child and his parent, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or
* * * * * *
(4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), ... and (ii) it is in the best interest of the child that this court assume jurisdiction.
N.J.S.A. 2A:34-31(a) (in relevant part). While obviously desirable, physical presence of the child in New Jersey is not a prerequisite for subject matter jurisdiction. N.J.S.A. 2A:34-31(c).
While the Act does not require blind obedience to home state jurisdiction, E.E.B. v. D.A., 89 N.J. 595, 610, 446 A.2d 871 (1982); N.J.S.A. 2A:34-31; UCCJA § 3, Commissioners' Note, home state jurisdiction is usually the first area of examination. "Home state" is defined by the Act as
the state in which the child immediately preceding the time involved lived with his parents, a parent or a person acting *937 as a parent, for at least 6 consecutive months.... Periods of temporary absence of any of the named persons are counted as part of the 6-month period
...
N.J.S.A. 2A:34-30(e). Home state jurisdiction is thus easily determined if a child is living with a parent in one state for at least six consecutive months prior to commencement of the custody proceeding, or if a child was removed from his home state within six months before commencement of the proceeding by a person claiming custody, as long as one parent continues to live in the forum state.
The determination of home state becomes more complex, however, if a child is temporarily absent from the home state during the relevant six month period. The challenge thus becomes to determine the meaning of "temporary absence," within the ambit of the Act. There is no reported New Jersey case defining the term "temporary absence." Webster's II New College Dictionary (1995) defines "temporary" as "lasting, used, or enjoyed for a limited time." Black's Law Dictionary (revised 4th edition) defines "temporary" as
[t]hat which is to last for a limited time only, as distinguished from that which is perpetual, or indefinite in its duration. Opposite of permanent.
"Temporary absence" within the ambit of the Act thus means an absence for a limited period of time from the forum that is the residence for a permanent, or indefinite, period of time. In determining whether an absence was temporary, courts must examine not only whether the child was physically present in the state but also how and when the child came to and remained in that state.
Upon Mr. Maqsudi's graduation from Harvard in June 1999, the parties purchased and closed on their Mendham home. It is undisputed that this residence was intended to be their permanent home. Testimony from their real estate agent demonstrated that the parties were concerned about schools in the area for their children. Family members testified that Mendham was to be where the Maqsudis intended to raise their children. Mr. Maqsudi testified to the elaborate furnishings and renovations of the home. The sheer size of the home itself indicated that this was no vacation home, no home of alternative residence.
Features of the parties' tenure in Uzbekistan also indicated that it was for a short period of time. The Maqsudis never established a permanent residence in Uzbekistan. They never owned a home in Uzbekistan, but lived in company-owned facilities, or with Ms. Karimova's father. New physicians were not established for the parties or the children. Continuous trips were made back to the Mendham home for renovation arrangements and vacation periods during Islam's first two years in school. Islam attended a school in Tashkent that was principally designed for transient children who would one day make their way back to the United States to an American school curriculum.
While there is no case law in New Jersey setting forth the contours of a "temporary absence," courts of other states have grappled with the question. See In Re Marriage of Richardson, 255 Ill.App.3d 1099, 193 Ill.Dec. 1, 625 N.E.2d 1122 (1993). (eleven month stay in Illinois for purpose of attending school with non-custodial mother considered temporary absence under UCCJA); Lemley v. Miller, 932 S.W.2d 284 (Ct.App.Tex.1996) (Texas home state of child despite temporary absence of 18 months while child's father on active military duty in Germany); and In Re Marriage of Holder, No. F036747, 2002 WL 443397 (Cal.App. March 20 2002) (unpublished opinion) (California home state *938 of child, despite family's moving from California to Germany for four year tour of military duty when child was one month old) (dissenting opinion, permanent duty station in Germany not temporary absence). The rationale of these cases, including both the majority and dissenting opinions In Re Marriage of Holder, all support this court's ruling that New Jersey is the home state for Islam and Iman, despite the family's temporary presence in Uzbekistan, because New Jersey is the only jurisdiction in which the Maqsudis had a "permanent" home, or a home of indefinite duration. New Jersey thus became the children's home state at least[5] as early as six months after they moved into the Mendham home in August 1999 and remains so to this day.
While this court finds that New Jersey is the home state of Islam and Iman pursuant to the UCCJA, it is the public policy of New Jersey that blind adherence to home state jurisdiction be avoided, if it is in the best interest of the child that a state other than the home state adjudicate custody because of a closer connection to the other state. Neger v. Neger, 93 N.J. 15, 25-26, 459 A.2d 628 (1983); UCCJA, § 3, Commissioners' Note; E.E.B., 89 N.J. at 609, 446 A.2d 871. N.J.S.A. 2A:34-31(a)(2) provides the basis for this "closer connection" jurisdictional standard.
The requirements of "closer connection" jurisdiction have also been met by Mr. Maqsudi in this matter: the children and the parties have the closer connection to the state of New Jersey and substantial evidence concerning the children's "present or future care, protection, training and personal relationships" is extant in New Jersey. Mr. Maqsudi clearly continues to reside in the state of New Jersey, voting in New Jersey, paying taxes in New Jersey and carrying a New Jersey driver's license. Ms. Karimova has substantial connections to New Jersey, owning the marital home in New Jersey, having bank accounts in New Jersey, and having spent a substantial amount of time in New Jersey over the last few years with the Maqsudi extended family.
In addition, evidence concerning the children's physical welfare is available in New Jersey through their doctors. Evidence concerning the quality of the Mendham school system is available in New Jersey. Moreover, evidence regarding Islam's past academic performance at the American International School in Tashkent is more available in New Jersey than in Tashkent: his teacher currently resides in Indiana and traveled to New Jersey in order to testify in this matter. Islam's school records in Massachusetts are also more available for proceedings in New Jersey than for proceedings in Uzbekistan. See N.J.S.A. 2A:34-47 (providing for exchange of pertinent UCCJA information between states).
Consistently shining through the hundreds of trial exhibits, however, is an interesting and meaningful element regarding best interests and closer connections: Islam and Iman, through the numerous videos, photographs, cartoon drawings, clothing and fixtures and decorations in their rooms in Mendham, appear to be thoroughly American children. Islam plays with Pokemon cards. He is a Yankees fan. He and Iman love birthday parties at Chuck E Cheese's. Islam speaks English, flies kites and blows out his own, as well as other children's, birthday candles, *939 just like most American kids. It is clearly in the best interest of Islam and Iman for this court to assume jurisdiction.
The Act also provides for New Jersey to assume subject matter jurisdiction if no other state would have jurisdiction and it is in the best interest of the child that New Jersey assume jurisdiction. N.J.S.A. 2A:34-31(a)(4). The Maqsudi children's best interests have been addressed above. It also appears that Uzbekistan would not have jurisdiction in accordance with home state jurisdiction or closer connection jurisdiction under the Act, for the very reasons that New Jersey does have jurisdiction pursuant to those standards, as discussed above. Thus, New Jersey has jurisdiction because no other state has jurisdiction and it is in the children's best interest for New Jersey to assume jurisdiction.
Moreover, if two states appear to have significant connections with the children and the parents, the state that is in the best situation, as the more convenient forum, to determine the best interests of the children should be the one to establish custody, E.E.B., 89 N.J. at 609, 446 A.2d 871.; D.B. v. R.B., 279 N.J.Super. 405, 411, 652 A.2d 1254 (App.Div.1995); N.J.S.A. 2A:34-29(c). New Jersey is clearly that state.

V.
This court having assumed subject matter jurisdiction to initiate or modify custody and parenting orders in this matter, the court must then scrutinize whether or not the Uzbek decree, granting custody of Iman and Islam to Ms. Karimova, will be enforced. N.J.S.A. 2A:34-51 provides for the recognition and enforcement of decrees in the international arena:
The general policies of this Act extend to the international area. The provisions of this act relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature and to custody rendered by appropriate authorities of other nations, if reasonable notice and opportunity to be heard were given to all affected persons.
N.J.S.A. 2A:34-51. The last clause of the Act is critical to a determination of this issue in this case.
Mr. Maqsudi received no notice of the proceedings pending in Uzbekistan and thus had no opportunity to be heard. There was substantial testimony on this issue during the course of the trial from both the court-appointed expert and Ms. Karimova's experts. None of the summonses fulfilled Uzbek or New Jersey law on notice. None of the summonses described the defendant's right to present evidence, instructions on service, or consequences of non-appearance. No complaint has ever been produced, nor do any certifications of service indicate that a complaint was ever attached to any of the documents. Even if the summons and complaint had been complete, none gave Mr. Maqsudi a meaningful opportunity to be heard, and in most cases not even the remotest opportunity to be heard. For example, the one notice issued for the September 28, 2001 hearing was purportedly issued on September 24 and posted on September 26, hardly sufficient notice, even had it been addressed to a residence of Mr. Maqsudi, which it had not. Six summonses were issued for the October 5 hearing date, three on September 28. The latter three summonses were purportedly posted on September 25. Apparently someone realized the "error" and generated three more summonses on October 3 and posted them on October 3. Even had they been addressed adequately, which they were not, they did not give Mr. Maqsudi reasonable *940 notice to prepare for the proceedings, even had he received them, which he did not. Accordingly, the Uzbek decree need not be recognized or enforced by this court.[6]

VI.
It is understandable that Ms. Karimova may wish to be close to the support and nurturance of her own family during the stress of divorce. She may not, however, deprive her husband of the love and companionship of their children for the sake of her comfort. New Jersey law provides both parents with equal rights to custody of their children, N.J.S.A. 9:2-4, and her conduct for the last year flies in the face of clearly prevailing law and public policy.
Except for two brief telephone conversations with Islam, Mr. Maqsudi has neither seen nor heard from his children for over one year. This custody matter must be resolved by this court expeditiously in order to mitigate, if possible, any damage that may have occurred, or may in the future occur, to the welfare of these children. Accordingly, this court is ordering that Ms. Karimova return Islam and Iman to New Jersey within 30 days. Ms. Karimova will be given 30 days in which to present the children in order to give her a reasonable opportunity to prepare them for their exit from Uzbekistan and their re-entry into New Jersey and to arrange for her own parenting time with the children in New Jersey. During that 30 day period of time, Ms. Karimova is ordered to follow the advice of the Guardian Ad Litem who will be appointed after conference with counsel so that the children may be appropriately prepared for their re-unification with their father. In addition, Ms. Karimova must arrange for immediate telephone contact between the children and their father, with that contact to take place initially within the next seven days and at a minimum of every other day thereafter until the children arrive in New Jersey.
Upon the children's arrival in New Jersey, a custody evaluation will be commenced immediately and completed within 30 days. The court vacates the default and allows Ms. Karimova 35 days to answer the complaint. The court encourages Ms. Karimova to participate in the evaluation, this court having been made aware of no reason why she would be inconvenienced by such participation. The court also orders that a status conference be conducted by telephone on a weekly basis until the custody evaluations commence.
NOTES
[1] All proceedings were conducted in Russian and all notices were printed in the Cyrillic alphabet. The court relied on expert witnesses for translations.
[2] While Ms. Karimova elected not to appear at the trial of this matter in New Jersey, in which she was represented by counsel, her credibility has nonetheless been called into question. Her testimonies at the two Uzbek proceedings were inconsistent with each other and with her obvious knowledge as to Mr. Maqsudi's whereabouts in New Jersey and his actual concerns. In addition, her certifications submitted to this court on motion unequivocally stated that neither of the children spoke English. Compelling videotapes at trial, in addition to the testimony of Islam's father, aunts, and first and second grade teacher, indicated that English was his native language. Mr. Maqsudi's testimony, however, was internally consistent and credible.
[3] The Act and case law recommend early communication between judges in differing jurisdictions as an aid to determining the appropriate forum. Ivaldi v. Ivaldi, 147 N.J. 190, 206, 685 A.2d 1319 (1996); N.J.S.A. 2A:34-29(b), (h). This court declined such communication, given the logistical complications and possible political ramifications.
[4] The 1980 Hague Convention on the Civil Aspects of International Child Abduction is not applicable to this case. While Uzbekistan and the United States are both signatories, the United States does not recognize Uzbekistan's status under the Convention.
[5] Arguably, New Jersey has been Islam's home state since he was six months old, as it appears that no other state has been the site of a permanent residence for Islam, the residence at Harvard having been only for a predetermined limited period.
[6] Mr. Maqsudi also argues that Uzbek legal institutions are not "similar in nature" to those of the United States, as required by N.J.S.A.2A:34-51. Substantial expert testimony was given at trial on this issue from all four expert witnesses, all of whom were candid and credible in their presentations to the court. The court need not reach this issue, however, as the question of whether or not the Uzbek legal institutions are similar in nature to ours does not come into play, given that Mr. Maqsudi received neither notice nor opportunity to be heard, both threshold requirements to recognition by this court.