845 A.2d 106

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. A.R.G., DEFENDANT–APPELLANT.

IN THE MATTER OF C.R.G., R.L.G. AND A.J.G., MINORS.

Argued January 20, 2004—Decided March 17, 2004.

266

*Aglaia Papadopoulos–Vlantes* argued the cause for appellant (*Papadopoulos–Vlantes & Moehring,* attorneys).

*Andrea M. Silkowitz,* Newark, Assistant Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Pamela A. Redd,* Deputy Attorney General, on the brief).

*Maria Emilia Borges,* Assistant Deputy Public Defender, argued the cause for respondents C.R.G., R.L.G., and A.J.G., (*Yvonne Smith Segars,* Public Defender, attorney; *Joseph F. Suozzo* and *Edward B. Marable, Jr.,* Deputy Public Defenders, of counsel).

*Melville D. Miller, Jr.,* President, argued the cause for *amicus curiae* Legal Services of New Jersey (*Mr. Miller,* attorney; *Mr. Miller* and *Nancy Goldhill,* on the brief).

*Mary E. Coogan* argued the cause for *amicus curiae* Association for Children of New Jersey (*Cecilia M. Zalkind,* attorney; *Ms. Coogan* and *Ms. Zalkind,* on the brief).

The opinion of the Court was delivered by

LONG, Justice.

This appeal, which is before us as of right based on a dissent in the Appellate Division, *Rule* 2:2–1(a)(2), involves the meaning of the term "aggravated circumstances" in *N.J.S.A.* 30:4C–11.3(a), the existence of which excuses the Division of Youth and Family Services ("DYFS") from providing statutorily required reasonable efforts at family reunification. Also implicated is the question of what process is due a parent prior to the entry of a trial court's initial finding of aggravated circumstances.

I

C.R.G., R.L.G., and A.J.G., aged 16, 10, and 9, respectively, are the sons of A.R.G. and his former wife, M.G. They lived with their mother in Florida until she died in a car accident in 1998. Thereafter, the children went to live with their father and paternal grandmother ("N.G.") in New Jersey.

On May 28, 2002, a school nurse received a phone call from an anonymous caller who stated that R.L.G. had been physically abused by his father. The nurse called R.L.G. to her office and verified numerous bruises on his arms, back, and buttocks. R.L.G. stated that the bruises were from a beating administered

by his father. The nurse called DYFS to report the matter, after which a caseworker, Dionis Burgos, went to the school and met with the nurse and R.L.G. The caseworker observed between nineteen and twenty-two bruises of varied hues and sizes on R.L.G.'s body. R.L.G. was dressed in a long-sleeved high-collared shirt, which he said his father told him to wear.

R.L.G. told the caseworker that his father began hitting him in September 2001 and that the latest beating occurred after he received a negative school progress report. In describing the incident that precipitated the call, R.L.G. told the caseworker that his father hit him with a belt and that his arms were bruised when he attempted to protect himself.

While at the school, the caseworker also spoke with the youngest sibling, A.J.G., and the children's paternal grandmother who had been called in. A.J.G. and N.G. confirmed they were present when R.L.G. received the beating. A.J.G. also confirmed that their father had pulled R.L.G.'s hair and kicked him in the back, leaving a shoe imprint, and that he had beaten R.L.G. on other occasions when the child received poor grades. N.G. initially denied, but later admitted, that her son beat R.L.G. N.G. further admitted that her son "is like a dictator in his own home" and yells at everyone. N.G. warned that A.R.G. is aggressive and that anger management classes would not help.

The caseworker accompanied the two children and N.G. home. While there, A.J.G. retrieved the belt used in the beating. The caseworker compared the belt to the marks on R.L.G.'s back and determined that a match existed.

The oldest child, C.R.G., arrived home shortly thereafter and the caseworker interviewed him as well. C.R.G. stated that he was not present when R.L.G. was beaten, but that afterward his grandmother had showed him R.L.G.'s bruises and remarked, "look what your father did to [R.L.G.]" C.R.G. also told the caseworker that the beating was not an isolated incident and that he himself had been beaten by his father until he stood up to him.

C.R.G. indicated that he feared that all the children would be hit now that DYFS was involved.

The caseworker went on to interview the boys' paternal aunt, C.G. C.G. admitted she made the anonymous call to the school nurse reporting the abuse, stating "the abuse had to stop." C.G. also stated that A.R.G. was abusive and that everyone in the home was afraid of his temper.

The caseworker took R.L.G. to Jersey City Medical Center where the child was examined by two physicians. The first, Dr. Pellicia, confirmed that R.L.G. had suffered at least four to five past beatings. Dr. Pellicia told the caseworker that the healing wounds, "particularly in the buttocks area, which was the more seriously injured, would probably leave scars . . . like birthmarks." R.L.G. also was examined by Dr. Radwan, the attending emergency room physician, who confirmed that R.L.G.'s "buttock area did not have time to heal and that a new beating was probably done on top of the healing wounds."

Based on A.R.G.'s physical abuse and N.G.'s awareness of and failure to prevent the abuse, DYFS effected an emergency removal of the children from the home and placed them in foster care. Later that day, A.R.G. was arrested and charged with Aggravated Assault contrary to *N.J.S.A.* 2C:12–1b; Endangering the Welfare of a Child contrary to *N.J.S.A.* 2C:24–4a; and Child Abuse contrary to *N.J.S.A.* 9:6–1 and 9:6–3, charges for which he was subsequently indicted. Bail was set at $50,000.

The following day, May 29, 2002, DYFS sought custody of the three children pursuant to *N.J.S.A.* 9:6–8.21 to –8.73 and *N.J.S.A.* 30:4C–12. A.R.G. was brought to court from the Hudson County Jail for the hearing. On that date, the trial court ordered emergency removal of the children from the home and continued custody in DYFS; no-contact between A.R.G. and children; a return date of June 26, 2002, on which A.R.G. would show cause why custody, care, and supervision of the children should not be continued in DYFS; representation of the children by the Office of the Law Guardian, and representation of A.R.G. by the Public

Defender's Office if financial circumstances warranted it. A.R.G. initially stated he would represent himself. The trial court nevertheless suggested that he consider legal representation because of the seriousness of the allegations and the possibility he could lose his children.

Later that day, the caseworker interviewed the childrens swimming coach by phone. The coach stated he never observed any marks on the children and that R.L.G. wore a Speedo to swim class. The coach also told the caseworker that the boys (R.L.G. and A.J.G.) had attended swimming practice on May 13, 16, and 22, 2002. The coach did not see R.L.G. again after May 22. Subsequently, the caseworker spoke with the child's school principal, who had received the initial anonymous phone call. The principal stated that she never had any trouble with the family, that the father seemed very involved in the childrens education, and that he was there for every event.

The caseworker also spoke with the paternal aunt, P.G., by phone. P.G. said that, in the past, she had reported the family to New York Social Services when she observed bruises on the children. DYFS verified the family's history with Child Protective Services agencies in New York and Virginia, but was unable to obtain the records because the records were sealed and then destroyed. However, DYFS was able to obtain divorce litigation records from Virginia that revealed a potentially tumultuous relationship between A.R.G. and M.G.

On May 30, 2002, the caseworker visited R.L.G. at his foster home and took photographs of his injuries. On June 3, 2002, the caseworker met with the three children together and they told her they did not want to return to their fathers care. The children expressed their desire to go to Florida and live with their maternal grandparents, with whom they had resided prior to their mothers death. Consequently, on June 6, 2002, the court ordered placement of the children with the maternal grandparents in Florida, pursuant to the Interstate Compact on the Placement of

Children (ICPC), *N.J.S.A.* 9:23–1 to –18. A.R.G. did not object to that placement, which was effectuated on July 3, 2002.

On June 7, 2002, A.R.G. was released on bail and met with the caseworker. He told the caseworker that he loved his children and wanted to be reunified with them. He stated that he did not believe he was an abusive parent, but that he made a grievous error. A.R.G. also stated that his children are very good students and education is very important to him. He indicated he was very upset when R.L.G. received a negative progress report in school and disciplined the child with a belt when he denied receiving it. A.R.G. claimed that the discipline was an isolated incident, no other children were hurt, and that he had no other experience with DYFS.

On that date, A.R.G. also reported that he had retained an attorney, who later filed a notice of appearance, and that he had sought out counseling, anger management, and parenting skills at Christ Hospital, despite his belief that he did not need counseling. DYFS also referred him for a psychological exam. On June 20, 2002, DYFS faxed a copy of the Divisions court report to A.R.G.s attorney.

On June 24, 2002, DYFS hand-delivered to the court, defense counsel, and the Law Guardian, a letter with an attached evidence packet containing contact sheets, the referral response report, and R.L.G.s certified medical records from the hospital. The letter confirmed that a fact-finding hearing was scheduled for June 26, 2002, and advised that on that date DYFS would make an application for a finding pursuant to *N.J.S.A.* 30:4C–11.3(a) and that only one witness would be called.

On June 26, 2002, the trial court conducted a fact-finding hearing. A.R.G. appeared at the hearing with substitute counsel. As the letter of June 24 presaged, DYFS asked the court to relieve the agency of its statutorily mandated duty to provide reasonable efforts toward family reunification. In support, DYFS cited the existence of aggravating circumstances, i.e., the abuse inflicted on the children by A.R.G.

The only witness presented at the fact-finding hearing was the DYFS caseworker. She testified to the facts of her investigation as outlined above and produced the various records contained in the DYFS file, including photographs taken of R.L.G.'s injuries. Over the objection of defense counsel regarding included hearsay, the DYFS file was admitted. However, the trial court agreed that any findings would have to be based upon competent evidence. The caseworker testified and was subjected to a lengthy cross-examination by A.R.G.'s counsel. The defense did not produce any witnesses.

Thereafter, based on the DYFS report, the caseworker's testimony, certified medical records, photographs, and arguments of counsel, the court ruled that DYFS had shown, by clear and convincing evidence, that R.L.G. had been subjected to aggravated circumstances of abuse and cruelty. The court stated that its findings were based in pertinent part on the twenty photographs portraying R.L.G.'s severely bruised body. The court noted that the photographs "did not overly exaggerate the extent [or] nature of the injury. Perhaps bruises are more colorful, demonstrative, but certainly the markings indicate a serious savage beating by [A.R.G.] upon the child." The court held that DYFS had established that A.R.G abused R.L.G. within the meaning of *N.J.S.A.* 9:6–8.21 and that the two other children were at risk based on the abuse of their brother. *N.J.S.A.* 9:6–8.46.

The court entered two orders reflecting what had occurred on June 26. The first order found that the removal and placement of the children was necessary due to imminent danger to their life, safety or health; that DYFS had established by clear and convincing evidence that R.L.G. had been abused by A.R.G.; that due to the severity of the abuse, the other children were at risk; and that reasonable efforts to reunite the family need not be provided. In the second order, the court held, among other things, that the no-contact provision was continued; that A.R.G. be restrained from visiting the home of the maternal grandparents; that A.R.G. submit to a psychological evaluation, anger management counsel-

ing, and parenting skills training; that DYFS be excused from reasonable efforts at reunification; and that on July 17, 2002, a permanency hearing pursuant to *N.J.S.A.* 9:6–8.54(b)(2) (requiring permanency hearing within thirty days after placement where court determines that reasonable efforts to reunify family not required under *N.J.S.A.* 30:4C–11.3) would be held.

On July 15, 2002, two days before the scheduled permanency hearing, A.R.G. filed a motion seeking a rehearing or reconsideration of the court's determination that DYFS was excused from providing reasonable efforts to reunify him with his children. The motion also sought an order requiring DYFS to provide him with services, and adjourning the permanency hearing.

The court held argument on the motion on July 17, before the hearing to approve the permanency plan. Ultimately, the court reiterated its finding that A.R.G.'s conduct constituted aggravated circumstances of abuse and cruelty and denied the motion. The court then conducted the permanency hearing, the goal of which was termination of A.R.G.'s parental rights and adoption by the maternal grandparents. The court approved the DYFS plan as appropriate, but requested DYFS to at least consider other options and reminded DYFS that it was statutorily required to establish each of the four prongs of the best interests test for termination of parental rights.[1]

The court entered a series of orders that denied A.R.G.'s motion for reconsideration, detailed its findings, required that visitation remain suspended, continued the no-contact order, directed that

---

[1] To establish a termination of parental rights pursuant to *N.J.S.A.* 30:4C–15.1(a), we held in *New Jersey Div. Of Youth and Family Services v. A.W.*, 103 *N.J.* 591, 512 *A.*2d 438 (1986), that there are four elements that must be met. DYFS must establish by clear and convincing evidence that: (1) the child's health and development have been or will be seriously impaired by the parental relationship; (2) the parents are unable or unwilling to eliminate the harm and delaying permanent placement will add to the harm; (3) the court has considered alternatives to termination, and; (4) the termination of parental rights will not do more harm than good.

the children receive a referral to a therapist, required a DYFS sponsored psychological evaluation of A.R.G., permitted A.R.G. to obtain his own psychological evaluation, approved the DYFS permanency plan of termination of A.R.G.'s parental rights with adoption by the maternal grandparents, directed DYFS to explore other alternatives to its adoption permanency plan, excused DYFS from providing reasonable efforts at reunification because the children had been subjected to aggravated circumstances of abuse, neglect, and cruelty, and directed DYFS to file a Guardianship Complaint by September 18, 2002. A.R.G. appealed the July 17, 2002, order.

On September 18, 2002, DYFS filed a Guardianship Complaint and moved to terminate A.R.G.'s parental rights on the grounds that there were aggravated circumstances of abuse and that DYFS was not required to make reunification efforts. The court terminated the child abuse and neglect action as superseded by the Guardianship Complaint and scheduled the matter for trial beginning on January 21, 2003.

On December 24, 2002, A.R.G moved before the Appellate Division to stay the Guardianship trial. The Appellate Division granted a stay pending the outcome of the appeal. *New Jersey Div. of Youth and Family Services v. A.R.G.*, 361 *N.J.Super.* 46, 62, 824 *A.2d* 213 (App.Div.2003). On June 5, 2003, the appeal was decided in favor of DYFS. In an opinion penned by Judge Fall, the court examined at length the legislative history of the Adoption and Safe Families Act (ASFA) and its implementing legislation nationwide. *Id.* at 63–78, 824 *A.2d* 213. More particularly, it surveyed the approaches taken by other states in defining "aggravated circumstances" and resolved to view the issue "through the lens of the legislative intent, that the safety of the child is the paramount concern." *Id.* at 76, 824 *A.2d* 213. The court ultimately defined the term "aggravating circumstances" as embodying

the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child, and would place the child in a position of an unreasonable risk to be reabused.

Moreover, any circumstances that increase the severity of the abuse or neglect, or add to its injurious consequences, equates to "aggravated circumstances." Whether couched as "severe child abuse or neglect," "serious child abuse or neglect," or "severe physical injury" of a singular, chronic, recurrent, or repetitive nature, where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety and welfare of the child, they are "aggravated" to the extent that the child welfare agency, here DYFS, may bypass reasonable efforts of reunification.

[*A.R.G., supra,* 361 *N.J.Super.* at 77, 824 *A.*2d 213.]

The court cautioned however that a finding of aggravating circumstances does not preclude the rendering of services. *Ibid.*

Turning to the record, the court concluded that the statements of the children, paternal grandmother, and paternal aunt, confirmed by expert medical evaluations and photographs, demonstrated that A.R.G. repeatedly subjected R.L.G. to beatings and abuse, contrary to his argument that the beating he inflicted was an isolated incident. *Id.* at 78, 824 *A.*2d 213. The panel noted that the lack of broken bones or protracted medical treatment was not dispositive of whether there were aggravated circumstances of abuse. *Id.* at 79, 824 *A.*2d 213. Similarly, the panel noted that the trial court was free to discount the statements of the swim coach and the children's principal, as recorded in the DYFS report. *Ibid.* The panel emphasized that termination of parental rights still requires DYFS to establish each of the four prongs of the "best interests" test by clear and convincing evidence during the Guardianship trial. *Id.* at 80, 824 *A.*2d 213.

Regarding due process, the court expressed the view that the evidence and circumstances forming the basis of the DYFS application for waiver were well known to A.R.G. and his counsel prior to the June 26 hearing and underscored A.R.G.'s failure to proffer any proofs to challenge the finding of "aggravated circumstances." *Id.* at 81, 824 *A.*2d 213.

The dissenting judge, Judge Eichen, agreed that the finding that R.L.G. was subjected to abuse by his father was supported by substantial, credible evidence in the record and further acknowledged that the evidence demonstrated A.R.G.'s repeated abuse of R.L.G., prior abuse of C.R.G., and abusive and controlling conduct

toward other family members, including his deceased wife, his mother and his sister. *A.R.G.*, *supra*, 361 *N.J.Super.* at 82–83, 824 *A.*2d 213, (Eichen, J., dissenting). However, the dissent noted its reservations about whether A.R.G.'s due process rights adequately were protected by the procedures followed. *Id.* at 83, 824 *A.*2d 213. More particularly, it pointed to the May 29, 2002, Order to Show Cause that did not contain a checkmark in the appropriate box to show what type of hearing was scheduled and to the belated notice that DYFS was seeking relief from its obligation to provide reasonable efforts toward reunification, delivered only two days before the fact-finding hearing. *Ibid.* The dissent also objected to the failure by DYFS to explain the meaning of the reference to a "finding pursuant to *N.J.S.A.* 30:4C–11.3(a)[.]," in the letter. *Id.* at 84, 824 *A.*2d 213.

In addition, the dissent expressed concern over whether the evidence presented actually rose to the level of aggravated circumstances of abuse. *Id.* at 88, 824 *A.*2d 213. The dissent questioned the lack of medical testimony concerning the full extent and nature of R.L.G.'s injuries, and the lack of a psychological evaluation of R.L.G. or the other children to determine the emotional effects of the abuse. *Id.* at 87–88, 824 *A.*2d 213. Judge Eichen explained:

> In the absence of such evidence, I have no confidence that a just result was reached in this case.
>
> . . .
>
> Unlike the circumstances in *In re Guardianship of B.L.A.*, 332 *N.J.Super.* 392, 753 *A.*2d 770 (Ch.Div.2000), this family had no prior history of intervention by the Division. Fundamental fairness required expert testimony and testimony of the adverse family witnesses before the court could properly conclude that DYFS had proved "aggravated circumstances of abuse" by clear and convincing evidence excusing it from making any efforts toward reunification.
>
> [*Id.* at 88, 824 *A.*2d 213.]

Finally, the dissent observed:

> [T]he majority has not articulated a useful standard for determining when "serious abuse" or "aggravated circumstances of abuse" has occurred. For instance, it is not clear whether conduct alone is sufficient to establish a case of "aggravated

circumstances of abuse" or whether the effect of that conduct must be factored into the equation. If the "effect" is a vital component, then expert evidence must be presented to aid the fact-finder to reach a just result.

[*Ibid.*]

It is that dissent that brings this case before us as of right. We granted *amicus* status to the Association for Children of New Jersey and Legal Services of New Jersey.

Since the time of the Appellate Division decision, we have been advised that A.R.G.'s children have been removed from the care of their grandparents due to the grandparents' declining health and inability to care for them. They are now together in foster care and their future with the grandparents or the foster family is as yet undetermined.

## II

A.R.G. argues that he was denied due process during the proceedings below because two days notice and a one-line reference to *N.J.S.A.* 30:4C–11.3(a) were inadequate to inform him that DYFS was seeking to be excused from its statutory obligation to reunify him with his children. He also alleges insufficiency of the evidence to support the aggravated circumstances because the only evidence presented to the trial court was from the DYFS caseworker, who relied almost entirely on hearsay; there was no medical and psychological testimony presented at the hearing to determine the extent and nature of the child's injury; there was no psychological evaluation of A.R.G. to assess whether services would have corrected the conditions that led to the abuse; and because the testimony of the swim coach and the children's principals was ignored.

DYFS urges affirmance based on the propriety of the aggravated circumstances standard the Appellate Division adopted, the application of that standard, and the conclusion that it was satisfied. DYFS also dismisses the "insufficient evidence" arguments as meritless pointing out the prior referral history with Child Protective Services in New York and Virginia, and the thorough

investigation of the caseworker, which included expeditious interviews of the school nurse, the principals, the swim coach, all the grandparents, two paternal aunts, A.L.G. and the three children. Further, DYFS maintains that the documentary and testimonial evidence of the caseworker was admissible because it was based on her firsthand observations of R.L.G.'s injuries that were then memorialized in photographs and because it accorded with the rules and statutes specifically developed for such proceedings. *See N.J.S.A.* 9:6–8.46(a)(4), and *R.* 5:12–4(d).

With respect to due process, DYFS contends that A.R.G. was represented by counsel on June 11 and was given access to DYFS materials immediately; that such notice was adequate to inform A.R.G. of its intentions, given that the statutory citation was direct and unambiguous; and that additional notice was given on the date of the hearing when DYFS twice stated before the hearing began that it intended to move for a finding under *N.J.S.A.* 30:4C–11.3(a). DYFS argues that A.R.G. agreed to proceed after acknowledging the request, despite the option to seek an adjournment.

The Law Guardian filed a brief on behalf of the children urging affirmance, contending that the record does not support the due process concerns raised by the dissent; that the evidence presented at the fact-finding hearing underpinned the existence of aggravated circumstances of abuse; that a finding of aggravated circumstances does not require a determination that reunification services would not correct the conditions leading to the abuse; that the statutory standard mandating the children's health, safety, and welfare to be the paramount concern is not altered by the children's placement with a relative; and that the majority decision protects parents' rights and balances them with the best interests of the child.

Amicus ACNJ urges affirmance of the majority decision. ACNJ emphasizes its support for family preservation and reunification efforts for the majority of families under DYFS' care, but notes that cases involving serious or chronic physical abuse or

sexual assault require a different assessment. ACNJ concludes that "aggravating circumstances" were properly defined and applied by the majority to include A.R.G.'s abusive behavior.

Amicus Legal Services urges us to reverse the Appellate Division's decision and clarify the procedures and standards that must be satisfied if DYFS is to be relieved of its obligation to provide reasonable efforts at reunification. Legal Services alleges that the importance of the rights at stake in this case and the lack of a clear definition of aggravated circumstances weighed against the trial court "cut[ting off] Mr. G. from his children without further consideration or more evidence."

### III

*N.J.S.A.* 30:4C–11.3 provides:

In any case in which the Division of Youth and Family Services accepts a child in care or custody, including placement, the division shall not be required to provide reasonable efforts to reunify the child with a parent if a court of competent jurisdiction has determined that:

a. The parent has subjected the child to aggravated circumstances of abuse, neglect, cruelty or abandonment;

b. The parent has been convicted of murder, aggravated manslaughter or manslaughter of a child; aiding or abetting, attempting, conspiring or soliciting to commit murder, aggravated manslaughter or manslaughter of a child; committing or attempting to commit an assault that resulted, or could have resulted, in significant bodily injury to a child; or committing a similarly serious criminal act which resulted, or could have resulted, in the death of or significant bodily injury to a child; or

c. The rights of the parent to another of the parent's children have been involuntarily terminated.

When determining whether reasonable efforts are required to reunify the child with the parent, the health and safety of the child and the child's need for permanency shall be of paramount concern to the court.

This section shall not be construed to prohibit the division from providing reasonable efforts to reunify the family, if the division determines that family reunification is in the child's best interests.

A permanency plan for the child may be established at the same hearing at which the court determines that reasonable efforts are not required to reunify the child with the parent, if the hearing meets all of the requirements of a permanency hearing pursuant to [*N.J.S.A.* 30:4C–61.2].

[*N.J.S.A.* 30:4C–11.3]

That statute, along with several others, was enacted to enable New Jersey to qualify for the continued federal funding of its child protection system, after ASFA (*Pub.L. No.* 105–89, 111 *Stat.* 2115 (1997)) became law. The overarching goals of ASFA have been described as follows:

> First, under current law, States must engage in "reasonable efforts" to help families that have abused or neglected their children. Some observers have argued that uncertainty about the reasonable efforts standard sometimes delays State action in making children available for adoption. In response to this problem, the bill requires States to define "aggravated circumstances" in State law, such as child torture or sexual abuse, that would permit the State to bypass the Federal reasonable efforts criterion and move more expeditiously to terminate parental rights and make a child available for adoption. In addition, States would not be required to reunite families in cases where a parent has murdered another child or lost their parental rights to a sibling. Second, the bill provides States with a $4,000 ($6,000 for special needs children) incentive payment for each adoption above the number of adoptions during the previous year. Third, in the case of children under age 10 who have been in foster care for at least 18 of the past 24 months, the bill requires States to move toward terminating parental rights under most circumstances. Taken together, these provisions and associated provisions of the Committee bill can be expected to produce a substantial increase in adoptions in the years ahead.
>
> [*H.R. Rep.* 105–77, at 7 (1997), *reprinted in* 1997 *U.S.C.C.A.N.* 1, 2739–40.]

In short, ASFA provides that in determining whether to make reasonable efforts to reunify children with their parents, health and safety are the paramount concerns, 42 *U.S.C.A.* § 671(a)(15)(A), and that reasonable efforts to reunite children with their parents "shall not be required ... if a court of competent jurisdiction has determined that (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse)[.]" 42 *U.S.C.A.* § 671(a)(15)(D)(i).

■■■ As noted, the Appellate Division in this case articulated a standard for establishing whether a "parent has subjected the child to aggravated circumstances of abuse, neglect, cruelty or abandonment" within the meaning of *N.J.S.A.* 30:4C–11, thus justifying waiver of the requirement of efforts toward family reunification. We restate that standard here:

"[A]ggravated circumstances" embodies the concept that the nature of the abuse or neglect must be so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child, and would place the child in a position of an unreasonable risk to be reabused.

Moreover, any circumstances that increase the severity of the abuse or neglect, or add to its injurious consequences, equates to "aggravated circumstances." Whether couched as "severe child abuse or neglect," "serious child abuse or neglect," or "severe physical injury" of a singular, chronic, recurrent, or repetitive nature, where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety and welfare of the child, they are "aggravated" to the extent that the child welfare agency, here DYFS, may bypass reasonable efforts of reunification.

[*A.R.G., supra,* 361 *N.J.Super.* at 77, 824 *A.*2d 213.]

We note that in ruling, the Appellate Division resorted to a detailed history of ASFA and drew on the efforts of other jurisdictions to define "aggravated circumstances." In a scholarly and thoughtful opinion, Judge Fall, writing for the Court, culled from those sources the standard to which we have adverted. We are satisfied that that standard faithfully carries out, as specifically as is possible, the aims of the statute and describes the circumstances that can be deemed sufficiently aggravated to make family reunification efforts unnecessary. We therefore affirm the Appellate Division with respect to that standard.

We add only this. As Judge Fall observed, that the notion of aggravated circumstances is not amenable to a rigid definition. Each case must be decided on its facts. Likewise, each determination must involve separate lines of inquiry. The first is whether the alleged conduct, in fact, took place. If not, the inquiry will end. If the conduct did occur, the next issue is whether it was severe or repetitive. If the answer is no, then family reunification efforts are required. If the answer is yes, the court then must determine whether reunification would jeopardize and compromise the safety and welfare of the child.

That inquiry in turn has two prongs—the first is whether the abuse was of such a nature that standing alone, it compels the conclusion that reunification should not be required. Judge Fall adverted to that prong when he stated:

> [W]here the parental conduct is particularly heinous or abhorrent to society, involving savage, brutal, or repetitive beatings, torture, or sexual abuse, the conduct may also be said to constitute "aggravated circumstances."
>
> [*A.R.G., supra*, 361 *N.J.Super.* at 77, 824 *A.*2d 213.]

In that situation, the abusive parent's future remedial efforts would be of no consequence. The acts complained of, by their very nature are, so unnatural or depraved that the fundamental bond that is the basis of the reunification notion is deemed to be irremediably undermined.

However, there is another class of cases adverted to both by Judge Fall and Judge Eichen, that requires inquiry beyond the mere conduct of the parent. Examples are abandonment, corporal punishment that does not result in permanent injury, serious neglect and mental abuse, to name a few, which may or may not have irremediably undermined the parent-child relationship and may or may not support the conclusion that reuniting the family will place the child at risk. In those cases, the court may consider whether to admit expert testimony about the conduct and its relationship to the parent-child bond along with an assessment of whether the parents' remedial efforts are sufficient to eliminate an unreasonable risk of re-abuse.

It is the result of all of those inquiries that will determine whether reunification efforts are required. In light of the fact that the trial court did not have the benefit of the Appellate Division's standard or our further elucidation of it, we remand the case to that court for consideration of the issue of aggravated circumstances, *de novo*.

## IV

The remand makes it unnecessary for us to grapple with the closer question of whether A.R.G. was afforded due process in these proceedings. However, we make the following observations.

The Fourteenth Amendment to the United States Constitution protects individuals against deprivations of life, liberty, or property, without due process of law. We have repeatedly af-

firmed that parental rights are fundamental and constitutionally protected. *Moriarty v. Bradt*, 177 *N.J.* 84, 109, 827 *A.*2d 203 (2003) (holding that because parental rights are fundamental, grandparents bear the burden of proving by preponderance of evidence that visitation is necessary to avoid harm). The basic indicia of due process are adequate notice and a meaningful opportunity to be heard. *Maqsudi v. Maqsudi*, 363 *N.J.Super.* 53, 57, 830 *A.*2d 929 (N.J.Super.Ch.2002) (concluding that court will not enforce divorce decree obtained in Uzbekistan as father was not afforded due process, notice and opportunity to be heard). To be sure, the constitutional protections surrounding family rights are tempered by the State's *parens patriae* responsibility to protect the welfare of children. *In Re K.H.O.*, 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999) (citing *Matter of Guardianship of J.C.*, 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992)). Nevertheless, the court's authority to remove children from the custody of their parents must be exercised with scrupulous adherence to procedural safeguards. *New Jersey Div. of Youth and Family Services v. J.Y.*, 352 *N.J.Super.* 245, 261, 800 *A.*2d 132 (2002).

 In our view, that usually requires more than a few days notice of what the State intends. Indeed when, as here, the State seeks to obtain a waiver of the duty to make efforts at family reunification, the parent should be given sufficient notice of that intention to obtain representation and prepare a meaningful defense. In addition, that notice should be much more than a mere statutory citation. Certainly it should contain statutory references, but it must also outline the underlying facts and theory on which the state intends to rely to prove aggravated circumstances warranting waiver of reunification efforts.

 If the case is based solely on the parent's depraved conduct (sexual abuse, torture, permanent injury), the parent should be advised of that fact. If the case is a combination of less egregious yet serious conduct, and its effect on the parent-child bond, the parent should be notified of that fact as well. The reason is that such knowledge is essential to the preparation of a defense. Although expert testimony would be useless in a de-

praved-conduct case, in a case involving serious neglect or repeated corporal punishment with no permanent physical consequences, expert testimony regarding the conduct, its effect on the parent-child bond, the parent's remedial efforts, and the avoidance of re-abuse might well be critical to the outcome. As Judge Fall noted, every case will be fact determined. Regardless of the facts, the foregoing is the due process template for disposition.

V

The judgment of the Appellate Division is affirmed in part and modified in part. The case is remanded for the proceedings to which we have adverted.

Justice LaVECCHIA, concurring.

I concur fully in Justice Long's opinion. I write only to add the following. This matter comes to us on a dissent in the Appellate Division that concluded that "the absence of appropriate due process safeguards requires a reversal" of the trial court. *New Jersey Div. of Youth and Family Servs. v. A.R.G.*, 361 *N.J.Super.* 46, 87, 824 *A*.2d 213 (App.Div.2003) (Eichen, J.A.D., dissenting). I cannot agree with the dissent's characterization of the proceedings below. This Court has recognized on numerous occasions that "[d]ue process is a flexible [concept]." *H.E.S. v. J.C.S.*, 175 *N.J.* 309, 321, 815 *A*.2d 405 (2003) (alteration in original) (citations and internal quotation marks omitted). I do not find in the circumstances of this matter a constitutional violation in respect of defendant's notice and opportunity to be heard.

Briefly, this case concerns DYFS's prompt response to undisputed evidence of a child's beating. DYFS effected an emergency removal of defendant's three children and filed a complaint for custody, accompanied by an order to show cause. The order to show cause detailed the abuse that supported the children's removal and the reason that efforts to prevent placement by DYFS were not reasonably available, namely, an imminent danger to the children's life, safety or health. The court set a hearing date one month later on the order to show cause.

Defendant, who had been charged criminally concerning the abuse and was incarcerated, was brought to court and served personally with the complaint and order to show cause. When defendant stated that he would be representing himself, the trial court urged otherwise because of "the seriousness of [plaintiff's] allegations and the possibility that [defendant] could lose his children." *Ante* at 273, 845 *A*.2d 111. Accordingly, defendant retained counsel for the criminal proceedings and this matter. Two days prior to the return date, defendant received a letter in which DYFS elaborated on the specifics of its request to the court. DYFS asked to be relieved under *N.J.S.A.* 30:4C–11.3(a) of the obligation to make reasonable efforts to reunify the children with defendant because of the risk of harm to the children described by the order to show cause. Based on the timing of that letter, defendant contended at oral argument before the Appellate Division that DYFS provided him with inadequate two-day notice in violation of his right to due process. In my view, that does not fairly describe all that took place.

Defendant had notice of what would be at stake at the hearing on the order to show cause. He was told in writing and by the judge in open court that his custody rights could be affected substantially based on the assertion of imminent danger to the children. Nonetheless, at the hearing defendant chose to put on no defense other than to rely "upon his penitence." *A.R.G.*, *supra*, 361 *N.J.Super.* at 80, 824 *A*.2d 213. The trial court repeatedly asked defendant's counsel if she would prefer to have an adjournment. She denied those offers.[1] Counsel acknowledged on the record that she understood that DYFS was requesting a determination pursuant to *N.J.S.A.* 30:4C–11.3(a) that reasonable efforts to reunify defendant with the children would not be

---

[1] For example, the following colloquy occurred at the June 26 hearing:

THE COURT: All right. Now we have to get to the second question. Ms. Redd is seeking a[de]termination that no [reasonable efforts to reunify]—be—be offered, and based upon that you have the right to a hearing.

MS. PAPADOPOULOS: Yes, I do.

THE COURT: Are you ready to proceed right now?

required. Only after she made those acknowledgments did the court proceed. Following the court's determination in favor of DYFS, defendant sought reconsideration. However, counsel did not argue that there was evidence that she was prevented from presenting, nor did she tell us, when asked to do so, how she would have defended differently. In sum, this record does not suggest a denial of due process, but rather reflects a calculated decision by counsel about how to represent defendant in this matter.[2] I agree with the Appellate Division majority that there was no constitutional due process deprivation in these circumstances.

Justice VERNIERO joins in this opinion.

*For affirmance in part; modify in part and remandment*—Chief Justice PORITZ, and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—7.

*Opposed*—None.

MS. PAPADOPOULOS: Yes, your Honor.
THE COURT: Ms. Papadopoulos, are you ready to have a fact-finding hearing today?
MS. PAPADOPOULOS: Your Honor, if the Court is ready, I'm certainly ready.
THE COURT: Do you wish to have a fact-finding hearing?
MS. PAPADOPOULOS: Yes.

[2] This case stands in contrast, for example, to *H.E.S., supra,* 175 *N.J.* at 324, 815 *A.2d* 405, where the defendant received the domestic violence complaint against him only one day prior to the return date and the defendant requested but was refused an adjournment.